## IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
## IN AND FOR ORANGE COUNTY, FLORIDA

Revere Entertainment Studios, LLC, a Florida limited liability company and Revere Entertainment Studios Australian Extremes, LLC, a Florida limited liability company,

      Plaintiffs,

vs.

Anheuser-Busch, Incorporated, a Missouri corporation, Anheuser-Busch InBev SA/NV, a Belgium corporation; Blackstone Capital Partners V L.P., a Delaware limited partnership; SeaWorld Parks & Entertainment, LLC, a Delaware limited liability company, f/k/a Busch Entertainment Corporation, a Delaware corporation; SeaWorld Parks & Entertainment, Inc., a Delaware corporation; Smithink, Inc., a Missouri corporation; The J co, LLC, a Missouri corporation; James Atchison, an individual; Keith Kasen, an individual; Brad Andrews, an individual; Steven Glashower, an individual; Stephen Frein, an individual; David Smith, an individual; and Jumana Brodersen, an individual,

      Defendants.

_____/

CASE NO.: 2011-_____

DIVISION: _____

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiffs, Revere Entertainment Studios, LLC, a Florida limited

liability company and Revere Entertainment Studios Australian Extremes,

eFiled in the Office of Clerk of Court, Orange County Florida 2011 Mar 31 12:53 PM Lydia Gardner

LLC, a Florida limited liability company (together "Plaintiffs"), sue defendants, Anheuser-Busch, Incorporated, a Missouri corporation; Anheuser-Busch InBev SA/NV, a Belgium corporation; Blackstone Capital Partners V L.P., a Delaware limited partnership; SeaWorld Parks & Entertainment, LLC, a Delaware limited liability company, f/k/a Busch Entertainment Corporation, a Delaware corporation; SeaWorld Parks & Entertainment, Inc., a Delaware corporation (hereinafter, collectively "SEAWORLD"); Smithink, Inc., a Missouri corporation (hereinafter "Smithink"); The J co, LLC, a Missouri corporation (hereinafter "JCo"); James Atchison, an individual; Keith Kasen, an individual; Brad Andrews, an individual; Steven Glashower, an individual; Stephen Frein, an individual; David Smith, an individual; and Jumana Brodersen, an individual (hereinafter, collectively "Defendants"), and allege:

## INTRODUCTION

1.     This case arises out of the Defendants' deliberate, willful and brazen misappropriation of the collective artistic energy and creativity of a team of designers, animators, graphic artists, music composers, writers, and business executives who collectively created an artistic vision for a new theme park resort attraction which the Defendants have exploited for their own financial gain without permission or payment.     The corporate

Defendants named herein own and operate, or previously owned and operated, SeaWorld, Busch Gardens, and Aquatica, which are three of the most highly visited and popular attraction theme parks in Florida. The popularity and profitability of these parks is largely derived from the artistic designs, themes and elements of their rides, facilities and amenities. Defendants, in order to induce the disclosure of the Plaintiffs' trade secrets, for use at their theme parks, entered into agreements, held confidential meetings, and promised confidentiality and payment. The Defendants proceeded to design and develop new attractions that utilized Plaintiffs' ideas and trade secrets without notice or compensation and in breach of their agreements with Plaintiffs. Plaintiffs' concepts, creations and designs triggered a ripple effect of creative change that would make the biggest splash in SEAWORLD's corporate history.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction because this Complaint seeks damages in excess of $15,000.00.

3.    Venue is proper in Orange County, Florida because many of the acts complained of herein occurred in Orange County, Florida, and the agreements at issue (as further defined below) were entered into in Orange County, Florida and provide for mandatory jurisdiction in Orange County,

Florida.

## THE PARTIES

### Plaintiffs

4.      Revere Entertainment Studios, LLC is a Florida limited liability company (hereinafter "Revere Entertainment"). Revere Entertainment entered into certain agreements with SEAWORLD which are relevant to this dispute.

5.      Revere Entertainment Studios Australian Extremes, LLC is a Florida limited liability company (hereinafter "Revere Australian") and a division of Revere Entertainment.  Revere Australian owns the copyright registrations relating to certain material relevant to this dispute and was the entity that created the Works (as defined hereinafter).

6.      Revere Entertainment and Revere Australian shall hereinafter collectively be referred to as "REVERE."

### SEAWORLD Defendants

7.      Upon information and belief, REVERE alleges that REVERE alleges that Defendant Anheuser-Busch, Incorporated (hereinafter "Anheuser-Busch") is a Missouri corporation conducting business in this County and throughout the state of Florida that owned and operated its wholly owned subsidiary Busch Entertainment Corporation, a Delaware

corporation (hereinafter "BEC") n/k/a SeaWorld Parks & Entertainment, LLC, a Delaware limited liability company, that in turn owned and operated SeaWorld Orlando for approximately twenty (20) years.[1] Anheuser-Busch was the parent corporation of BEC, a party to the agreements at issue (as further defined herein), and owned all BEC's assets.

8.     Upon information and belief, REVERE alleges that REVERE alleges that on or about November 18, 2008, Anheuser-Busch sold BEC to Defendant InBev SA/NV, a Belgium corporation, which then changed its name to Anheuser-Busch InBev SA/NV, a Belgium corporation (hereinafter "InBev"), conducting business in this County and throughout the State of Florida. In so doing, upon information and belief, Anheuser-Busch and BEC assigned their rights under the agreements (defined below) to InBev.  InBev was the parent corporation of its wholly owned subsidiary BEC, a party to the agreements at issue (as further defined herein), and owned all BEC's assets following the November 18, 2008 transaction.

9.     Upon information and belief, REVERE alleges that REVERE alleges that on or about December 9, 2009, InBev sold BEC to Blackstone Capital Partners V L.P., a Delaware limited partnership (hereinafter "Blackstone"), conducting business in this County and throughout the State

---

[1] BEC purchased SeaWorld Orlando in 1989. See
http://anheuserbusch.com/History.html

of Florida. In so doing, upon information and belief, InBev and BEC assigned their rights under the agreements (as further defined below) to Blackstone. Blackstone is the parent corporation of its wholly owned subsidiary BEC, a party to the agreements at issue (further defined herein), and currently owns all BEC's assets. Upon information and belief, REVERE alleges that REVERE alleges that Blackstone is an investor fund owned and advised by the publicly held limited partnership, The Blackstone Group, L.P.

10. Anheuser-Busch, InBev, and Blackstone have purposefully availed themselves of forum benefits, have offices, subsidiaries, affiliates, and/or agents in Florida and have transacted business within Florida and contracted to supply goods or services in connection with the matters giving rise to this suit. Upon information and belief, REVERE alleges that Anheuser-Busch, InBev, and Blackstone have been or are also the general managers of and own or owned, control or controlled, and conduct or conducted business as other entities including, but not limited to SeaWorld Parks and Entertainment, LLC and SeaWorld Parks and Entertainment, Inc.

11. Upon information and belief, REVERE alleges that Defendant SeaWorld Parks & Entertainment, LLC (hereinafter "SeaWorld LLC") is a Delaware limited liability company, f/k/a Busch Entertainment Corporation,

a Delaware corporation [BEC] conducting business in this County and throughout the State of Florida and that currently or previously has owned or operated ten (10) theme parks, including, SeaWorld Orlando, Busch Gardens, Aquatica, SeaWorld San Diego, SeaWorld San Antonio, and Discovery Cove that are relevant to this dispute.

12.     Upon information and belief, REVERE alleges that SeaWorld Parks & Entertainment, Inc. (hereinafter "SeaWorld Inc.) is a Delaware corporation conducting business in this County and throughout the state of Florida, and SeaWorld Inc. is the parent corporation of BEC and a party to the agreements at issue (further defined herein).

13.     Upon information and belief, REVERE alleges that SeaWorld Inc. is owned by Blackstone, a publicly traded company.  Upon information and belief, REVERE alleges that SeaWorld Inc. is also the general manager of and owns, controls, and conducts business as, other entities including, but not limited to SeaWorld LLC, f/k/a BEC.

14.     SeaWorld LLC and SeaWorld Inc. have purposefully availed themselves of forum benefits, have offices, subsidiaries, affiliates, and agents in Florida, have transacted business within Florida, and contracted to supply goods or services in Florida in connection with the matters giving rise to this suit.

15.     Upon information and belief, REVERE alleges that at all times material hereto BEC was owned by its parent, Anheuser-Busch, or its parent, InBev.  Upon information and belief, REVERE alleges that BEC, through merger or acquisition, became SeaWorld LLC and is owned by its current parent entity, the publicly held Blackstone.

16.     Under 28 U.S.C. § 1332, SeaWorld LLC is a citizen of the State of Florida as SeaWorld LLC's principal place of business, i.e. its headquarters, is in Orlando, Orange County, Florida. SeaWorld LLC's nerve center exists in Orlando, which is where the executives and officers direct, manage, control, and coordinate SeaWorld LLC's activities for its 10 theme parks, 5 of which are located in Florida.

17.     In or about July 2008, SeaWorld LLC moved its corporate offices from St. Louis, Missouri to the physical location of 9205 South Park Center Loop Suite 400 Orlando, Florida 32819.  As of October 2007 when SeaWorld LLC's move to Orlando was announced, four of the ten vice presidents and approximately 10,000 employees were based in Orlando, and 33 to 55 top executives and staff members were reported to be making the move from St. Louis to Orlando.[2]  In or about October 2007, SeaWorld LLC President James Atchison stated, "We've recognized over time that . . . we

---

[2] http://articles.orlandosentinel.com/2007-10-25/business/SeaWorld25_1_busch-seaworld-orlando-move-to-orlando

have . . . half our operations here in Florida," including the flagship park, SeaWorld Orlando.[3] President James Atchison explained, "This is a big statement on our part, and on Anheuser-Busch's part, and Busch Entertainment Corp.'s, that we're moving our headquarters here and we want to be in theme-park central and make sure our corporate culture is engaged here locally."[4]

18.    SeaWorld LLC's Orlando headquarters is the center of control for the ten theme parks owned and operated by SeaWorld LLC.

19.    Under 28 U.S.C. § 1332, InBev is a citizen of the State of New York as its principal place of business within the United States, i.e. its headquarters or "Functional Management Office," is in New York, New York.  InBev's nerve center exists in New York and is where the executives and officers direct, manage, control, and coordinate InBev's United States' activities.

20.    Upon information and belief, REVERE alleges that for purposes of the agreements, claims and allegations herein, Anheuser-Busch, InBev, Blackstone, BEC, SeaWorld LLC, SeaWorld Inc. and their affiliates, not all of whom are known at this time, are, and all times material hereto, were principals and agents of one another, the alter-egos of each other, with

---

[3] Id.
[4] Id.

a unity of interest and ownership among them and their subsidiaries and affiliates such that any separateness has ceased to exist.  For purposes of the agreements, claims and allegations herein, Anheuser-Busch, InBev, Blackstone, BEC, SeaWorld LLC, SeaWorld Inc. and their affiliates used the assets of the other for its/their separate, individual purposes; transferred valuable assets, property rights and/or interests to each other without adequate consideration; share common ownership; have financial dependency upon each other; have control significant over each other's marketing, finances, and policies; share and/or file joint financial statements; and have interrelated activities such that any purported corporate separation is merely formal and technical. Consequently, for purposes of the agreements, claims and allegations herein, Anheuser-Busch, InBev, Blackstone, BEC, SeaWorld LLC, SeaWorld Inc. and their affiliates bear joint and several liability for the obligations and responsibilities of one another.

## Other Corporate Defendants

21.    Smithink is a Missouri corporation and owned/operated by David and Linda Smith.  Smithink's Chief Executive Officer, David Smith was at all time material hereto also SEAWORLD's Vice President of Entertainment through approximately 2008 and he was present at

REVERE's Second Presentation (as defined below).

22.     JCo is a Missouri corporation and owned/operated by its President, Jumana Brodersen, who was also SEAWORLD's Corporate Director of Creative Development from the time of REVERE's Second Presentation (as defined below) through approximately 2008.

## Individual Defendants

23.     James [Jim] Atchison is an individual, an Orange County, Florida resident, and is an executive with SEAWORLD.

24.     Keith Kasen is an individual, an Orange County, Florida resident, and was an executive with SEAWORLD.

25.     Brad Andrews is an individual, an Orange County, Florida resident, and is an executive with SEAWORLD.

26.     Steven Glashower is an individual, an Orange County, Florida resident, and is an executive with SEAWORLD.

27.     Stephen Frein is an individual, a Missouri resident, and is an executive with SEAWORLD.

28.     David Smith is an individual, a Missouri resident, was an executive with SEAWORLD, and is Smithink's Chief Executive Officer.

29.     Jumana Brodersen is an individual, a Missouri resident, was an executive with SEAWORLD, and is President of JCo.

## REVERE'S AND WORKS

30.     REVERE is comprised of twenty-two (22) highly experienced designers, animators, graphic artists, music composers, writers, and business executives, which constituted the team of crew members (hereinafter the "REVERE Team"). The REVERE Team specifically has extensive experience in the theme park and attractions industry.

31.     Starting in 1999, the REVERE Team created the concept of a theme park design, theme, and fantasy to turn the world upside down and bring Australia to America through a themed attraction they entitled "Australian Extremes," which was comprised of five (5) main components: (1) a ride and animal park, (2) a water park, (3) an entertainment complex, (4) a hotel, and (5) a golf course (hereinafter "Australian Extremes").

32.     From approximately 2004 through 2006, the REVERE Team created an original concept, business plan, and original designs (hereinafter collectively, the "Works"), including, without limitation:

a)     The entire creative concept embodied by Australian Extremes;

b)     REVERE's (called the "submitting party") submission to SEAWORLD of its "products, ideas and materials" pursuant to the Agreement (as defined below) in Sections preamble and 1-4;

c)      Designs and drawings containing ideas and elements for Australian Extremes;

d)      Collection of original art compiled into a work of the visual arts for Australian Extremes;

e)      Audio-visual presentation for Australian Extremes;

f)      Computer Graphics renderings of Australian Extremes;

g)      Sound Recording track for Australian Extremes;

h)      Compilation of ideas and information containing descriptions and supporting material for Australian Extremes;

i)      Bound collection of art derived from the collection of original art submitted for Australian Extremes;

j)      Business plan for executing, developing, and promoting Australian Extremes;

k)      Marketing plan for executing, developing, and promoting Australian Extremes;

l)      Construction estimates for executing, developing, and promoting Australian Extremes; and

m)      Plan for developing strategic partnerships with sponsors/vendors (e.g., the Australian Trade Commission).

33.    The Works have tremendous commercial value and were

specifically created for purchase by, or joint venture with, SEAWORLD.

34.     The Works combine ideas which are novel and unique concepts, designs, motifs, plans, and patterns for the theme park industry, and for SEAWORLD in particular and which could be used to develop new and profitable attractions.

35.     REVERE made reasonable efforts to keep the Works confidential, secret and unavailable to the general public, other than those selected to have carefully restricted access for limited purposes.

36.     The Works constitute trade secrets as defined in Chapter 688, *Florida Statutes*.

37.     The Works were created by the REVERE Team and are works made for hire which are owned by REVERE.

38.     REVERE independently authored and created the Works as original work from 1999 through April 2006.

39.     REVERE has at all material times hereto owned the right to sell an exclusive or nonexclusive license to the Works.

40.     REVERE has been and still is the sole proprietor of all right, title, and interest in and to the Works.

## REVERE'S FIRST AGREEMENT WITH, AND PRESENTATION TO, SEAWORLD

41.     Prior to the fall of 2005, REVERE conducted extensive

research as to opportunities to exploit Australian Extremes in the theme park industry and identified SEAWORLD as the primary target.

42.    In or about the fall of 2005, REVERE's representatives contacted Senior Vice President Brad Andrews, an agent and executive of SEAWORLD (hereinafter "Andrews"), to discuss selling or licensing REVERE's Works for Australian Extremes to SEAWORLD, and/or being paid to develop and/or assign the works for SEAWORLD theme parks and attractions, and, additionally, to form a long term strategic partnership for ongoing consultation and development of future projects with SEAWORLD.

43.    REVERE put SEAWORLD's Andrews on express notice of their proprietary Works in discussions prior to submitting the works and at the time of REVERE's initial communications with Andrews.

44.    SEAWORLD's Andrews stated that the Works were of interest to SEAWORLD's anticipated future growth.

45.    SEAWORLD's Andrews communicated with REVERE representatives orally and in writing with REVERE from his SEAWORLD offices and agreed to schedule a meeting in order for REVERE to disclose the Works with SEAWORLD's representatives, including Andrews.

46.    On or about November 16, 2005, SEAWORLD, Andrews, and REVERE had a meeting (hereinafter the "First Presentation") at The

Peabody Hotel in Orlando, Florida, and Andrews presented REVERE with his official SEAWORLD business card.

47.    At the First Presentation, Andrews agreed to the following (hereinafter the "First Agreement") prior to REVERE's disclosure of the Works ("The First Agreement"):

a)    REVERE's Works were confidential;

b)    REVERE's Works were trade secrets and proprietary;

c)    REVERE could trust SEAWORLD's confidentiality in disclosing the Works;

d)    REVERE could trust SEAWORLD not to use the Works without financially compensating REVERE;

e)    SEAWORLD would pay REVERE for the Works or for their use in the event that SEAWORLD used the Works or any part thereof;

f)    The meeting was for the purpose of being approved to make a second presentation to Andrews and other SEAWORLD Executives who had the authority to finalize a formal written long term agreement; and

g)    Andrews would convey REVERE's proposal and confidential Works to SEAWORLD Executives who would abide by the terms agreed for disclosure.

48.    In reliance upon Andrews' representations, REVERE expended hundreds of hours and work and assembled the REVERE Team for the important presentation.

49.    REVERE presented to Andrews and SEAWORLD its confidential and proprietary information and concept contained within the Works for the project Australian Extremes as a destination resort with an Australian theme.

50.    Andrews stated that REVERE's Works would be a benefit to SEAWORLD and made statements such as "we [SEAWORLD] would love this [great white shark in captivity]" and "we [SEAWORLD] see it [Australian Extremes] in our future."

51.    Andrews stated that REVERE's Works, concept, and strategic Business Plan of an Australian theme park would be novel and new to SEAWORLD and that he wanted the SEAWORLD Executives to be presented with REVERE's Works and Business Plan for SEAWORLD.

52.    Andrews, by his words and conduct, led REVERE to believe that SEAWORLD and REVERE were entering into a confidential business

relationship together.

53.    As a result of Andrews' review of the Works during the First Presentation, Andrews contacted SEAWORLD executives and provided them with a summary and initial evaluation of the Works.

54.    SEAWORLD then contacted REVERE to request a second presentation (hereinafter the "Second Presentation") to persons at SEAWORLD who had the authority to finalize the terms of purchasing and/or investing in REVERE's Works.

55.    SEAWORLD and Andrews stated that prior to the Second Presentation, REVERE should expend yet additional time and money to prepare by doing the following:

    a)    Prepare multiple presentation packages, eventually refined to a request for six (6) packages;

    b)    Come to the SEAWORLD Executive offices;

    c)    Prepare a PowerPoint presentation;

    d)    Bring the entire REVERE Presentation Team; and

    e)    Modify their First Agreement with an additional written non-disclosure agreement.

56.    SEAWORLD required assurance that REVERE's ownership of the Works was documented, and thus, Andrews instructed REVERE that

they should copyright their Works in advance of the Second Presentation.

57.    In reliance upon Andrews' and SEAWORLD's inducement, the REVERE Team expended tens of thousands of dollars, together with significant time and effort, to prepare for the Second Presentation, including creating and designing a PowerPoint presentation of the Works, videos, music, art, and drawings for SEAWORLD illustrating Australian Extremes.

58.    Prior to the Second Presentation, on or about April 20, 2006, SEAWORLD Executive Vice President of Discovery Cove, Stewart Clark, met with REVERE agents for an additional meeting at Discovery Cove, where the Second Presentation would take place.  Executive Stewart Clark, on behalf of SEAWORLD, met with REVERE and reviewed the procedures, layout, and issues for the upcoming Second Presentation.   In addition, Executive Stewart Clark gave REVERE's agents a 'behind the scenes' tour of SEAWORLD's park, Discovery Cove.

## REVERE'S SECOND AGREEMENT WITH, AND PRESENTATION TO, SEAWORLD

59.    SEAWORLD's representative Andrews coordinated the Second Presentation.

60.    In advance of REVERE's Second Presentation to SEAWORLD executives, SEAWORLD's legal department contacted REVERE and as a result REVERE and SEAWORLD entered into a "Non-Confidentiality

Agreement" dated April 24, 2006 (hereinafter the "Agreement"), a true and correct copy of which is attached and incorporated hereto as **Exhibit "A."** The Agreement was prepared by BEC and signed by REVERE; BEC did not even have a signature block on the Agreement.

61.  SEAWORLD's Agreement provided the following:

a)  The Agreement was binding upon BEC, "its parent, its subsidiaries and affiliates" and/or "their respective successors or assigns" who have rights and obligations under the Agreement (*see* **Exhibit "A"**, Agreement, preamble and ¶10);

b)  The Works as defined in the Agreement are REVERE's "products, ideas or materials" submitted by REVERE (*see* **Exhibit "A"**, Agreement ¶ preamble and 1-4);

c)  The Works were not confidential as to the limited universe of SEAWORLD and its designers and executives that would necessarily have to review the Works to finalize payment (*see* **Exhibit "A"**, Agreement ¶1, 2);

d)  A written agreement regarding further details and payment would be executed should SEAWORLD use REVERE's Works (*see* **Exhibit "A"**, Agreement ¶3);

e)  SEAWORLD would pay REVERE for its "products, ideas or

materials" if used (*see* **Exhibit "A"**, Agreement ¶ preamble and 1-4);

f)      REVERE's Works were to be copyrighted for the purpose of demonstrating that REVERE's owned the submission (i.e. the Works) and that were recorded in a tangible medium (*see* **Exhibit "A"**, Agreement ¶4); and

g)      Various procedures were established for any later-obtained patents, trademarks, or copyrights relating to REVERE's Works after the Second Presentation (*see* **Exhibit "A"**, Agreement ¶5-8).

62.     To induce REVERE to sign the Agreement, SEAWORLD agreed that the Works and the creative concepts embodied therein were confidential and that REVERE's rights to the Works were and would remain protected.

63.     In addition, SEAWORLD also further induced REVERE to enter into the Agreement through and representations and written correspondence, including, without limitation, an email from SEAWORLD to REVERE's agents and representatives, including their legal counsel, a true and correct copy of which is attached and incorporated hereto as **Exhibit "B."** SEAWORLD's legal counsel stated in relevant part:

". . . [the Agreement] recognizes their rights as long as they are covered by patent or copyright registrations. The purpose of our non-confidentiality agreement is to allow for the initial exchange of information and, if you wanted to go forward, follow up with a detailed contract."

64.    For the Second Presentation, on or about April 25, 2006, at 1:00 p.m., REVERE presented the Works to SEAWORLD at Discovery Cove's Executive Suite.

65.    Present on behalf of SEAWORLD were the following representatives and executives (hereinafter collectively, the "SEAWORLD Executives"), four of which flew to Orlando, Florida from St. Louis, Missouri:

a)    Brad Andrews – Vice President of Zoological Operations;

b)    Keith Kasen – Chairman and President;

c)    Jim Atchison – Executive Vice President and General Manager of SeaWorld Orlando and Discovery Cove – [now President of SEAWORLD];

d)    Steve Frein – Vice President of Planning and Development;

e)    Steven Glashower – Vice President of Engineering and Creative Development; and

f)      David Smith – Vice President of Entertainment [who also

became the Chief Executive Official of Smithink].

66.    Prior to the Second Presentation, REVERE corresponded with

SEAWORLD Executive Steve Frein, Vice President of Planning and

Development, to confirm their understanding of the terms of the Agreement

and as to the protocol of the Second Presentation.  SEAWORLD Executive

Steve Frein asked REVERE if the Works were copyrighted, and upon

REVERE's confirmation, Steve Frein responded favorably by stating,

"That's good."

67.    Additionally, SEAWORLD and REVERE further clarified or

modified the Agreement prior to the presentation by orally agreeing to the

following additional terms:

a)      REVERE was presenting their Works and the Australian

Extremes destination resort concept on the condition of payment by

SEAWORLD;

b)      SEAWORLD would not use or exploit REVERE's

Works without financially compensating REVERE; and

c)      REVERE's Works and all materials used during the

Second Presentation were confidential and would not be removed

from the presentation room.  Specifically, SEAWORLD Executive

Steve Frein assured REVERE that he would personally safeguard REVERE's Works and ensure their return to REVERE at the conclusion of the Second Presentation.

68.     In particular, REVERE Team member Joe Allen stated that REVERE was disclosing the Works to SEAWORLD and their creative concept and confidential business plan on the condition of payment by SEAWORLD should SEAWORLD elect to exploit the Works.  REVERE confirmed from the SEAWORLD Executives that this was a material term of their Agreement before giving the Second Presentation.

69.     Upon SEAWORLD's approval and acceptance of the aforementioned clarifications or modifications of the Agreement, REVERE proceeded with the Second Presentation disclosing their Works and creative concepts for Australian Extremes.

70.     REVERE disclosed the Works to the SEAWORLD Executives through a PowerPoint presentation, as well as in twelve (12) books, including a presentation booklet (12"x12") with detailed drawings and illustrations of the Works for Australian Extremes (hereinafter the "Illustrated Attraction Book"), a true and correct copy of which is attached and incorporated hereto as **Exhibit "C"** as well as an 8 ½" x11" booklet of REVERE's creative concept and business plan with detailed descriptions,

names of facilities, costs, and project logistics (hereinafter the "Business Plan"), a true and correct copy of which is attached and incorporated hereto as **Exhibit "D."**   The Illustrated Attraction Book and the Business Plan (hereinafter together the "Books") contained, among other things, detailed drawings, story lines for attractions/exhibits, menu items, animal characters and attraction names with logo treatments.

71.   During the Second Presentation, REVERE disclosed in detail their creative concepts, confidential and proprietary secrets, the Works, the Business Plan, how to exploit the creative concepts and the Works, strategy, concepts, marketing, execution, and the methods in which SEAWORLD's parks would be transformed into a new look and design by incorporating REVERE's Australian themes.

72.   REVERE proposed to sell and assign ownership in the Works to SEAWORLD and offered to provide ongoing development consulting services as additional consideration for a partnership interest with SEAWORLD regarding the long term use of the commercial exploitation of the Works.

73.   Also during the Second Presentation, REVERE disclosed their Business Plan containing construction proformas for the development of Australian Extremes.

74.     At the conclusion of the Second Presentation, the SEAWORLD Executives unabashedly expressed their strong desire to commercially exploit REVERE's Works and pursue a confidential business relationship with REVERE.

75.     SEAWORLD President Keith Kasen stated:

**"Wow, where do I sign up?  This is the most thought out and detailed proposal we have seen in 15 years."**

76.     The SEAWORLD Executives, including SEAWORLD President Keith Kasen, asked numerous questions, including, without limitation, asking where the envisioned theme park resort could be located, the approximate acreage that would be needed, the development costs, which animals would best integrate with the Australian venture, and multiple logistical issues.

77.     SEAWORLD Executive David Smith stated particular interest in REVERE's storytelling aspect of each and every attraction, expression, and theme park element.

78.     REVERE's financial compensation plan, which was standard in the industry, provided fees to REVERE in an amount equal to 3.5% of the estimated construction costs of Australian Extremes or of its particular elements, and SEAWORLD would have known and expected, as a

minimum, to pay REVERE the same.

79.     REVERE's valuation of the Works was thus 3.5% of the construction costs for Australian Extremes, a percentage REVERE based upon research of industry standards for designers of other theme parks of comparable scope and magnitude.

80.     During the Second Presentation, the SEAWORLD Executives made further statements to REVERE Team Members, including between Joe Allen and Steven Glashower, SEAWORLD's Vice President of Creative Engineering and Development, about SEAWORLD's intention of preparing a written agreement as provided for in Section 3 of the Agreement, the procurement of Australian animals to the United States, and REVERE's opportunity to design other attractions for SEAWORLD that needed updating and a new theme.

81.     In addition, David Smith, Vice President of Entertainment, and Steve Frein, Vice President of Planning and Development, made the same statements to REVERE Team Member Walt Griggs.

82.     Despite having an agreement that REVERE's Books would not be removed from the presentation room and despite knowing such materials were both REVERE's property and REVERE's original and proprietary information, the SEAWORLD Executives shocked REVERE by leaving the

room with all 12 of REVERE's Books consisting of 6 Illustrated Attraction Books and 6 Business Plans.

83.    Rather than make an issue of it, REVERE relied upon the Agreement, SEAWORLD's representations, and trusted that SEAWORLD would safeguard the Books and not use or publicly disclose the contents therein.

84.    SEAWORLD did not immediately return REVERE's Books. SEAWORLD kept the 12 Books for approximately one (1) month and finally, after REVERE's requests, returned only 5 of the 6 sets of Books.

85.    REVERE demanded the return of the remaining 2 Books, but SEAWORLD failed to return them.

86.    SEAWORLD thus misappropriated and converted to its own use one copy of the Illustrated Attraction Book and one copy of the Business Plan.

87.    To date, one set of REVERE's Books still remains in SEAWORLD's possession.

### REVERE's Expected Payment

88.    SEAWORLD knew that REVERE presented and disclosed the Works in exchange for payment.

89.    In addition to agreeing to REVERE's payment as a condition to

the First and Second Presentations, REVERE's Business Plan, which was disclosed to SEAWORLD, provided for payment.

90.     REVERE's reliance of the express condition of payment was also evidenced in the "Goals" of the Business Plan, which are, among other things, "To complete the design and planning of Australian Extremes, sell the concept and facilitate its development" and "To create, sell and facilitate the development of a second, one-of-a-kind theme park." *See* **Exhibit "D"** REVERE's Business Plan, V. "Our Goals."

### Letters Between REVERE and SEAWORLD

91.     Immediately following the Second Presentation, REVERE sent the SEAWORLD Executives thank you letters dated April 26, 2006 (hereinafter the "REVERE Letters"), true and correct copies of which are attached and incorporated hereto as **Composite Exhibit "E."**  The REVERE Letters further confirmed their agreement of working with SEAWORLD based upon SEAWORLD's affirmations at the Second Presentation.

92.     In reliance upon the SEAWORLD Executive's representations during the Second Presentation, REVERE continued to exert time, money, and effort on the confidential Business Plan.

93.     For approximately one (1) month after the Second Presentation, REVERE did not hear back from SEAWORLD and REVERE continued to

work.

94.    Notwithstanding SEAWORLD's prior representations to REVERE that SEAWORLD would conclude an agreement for Australian Extremes, by correspondence dated on or about May 23, 2006 (hereinafter the "SEAWORLD Letter"), SEAWORLD Executive Steve Frein abruptly informed REVERE that: "Although the Australian Extremes project did not fit Busch Entertainment's investment strategy, I do believe an opportunity exists for the companies to collaborate on future attraction projects." The SEAWORLD Letter also returned to REVERE only five of the six sets of their Books. A true and correct copy of the SEAWORLD Letter is attached and incorporated hereto as **Exhibit "F."**

95.    Approximately seven (7) months after the Second Presentation, in or about October 2006, REVERE Team Member Joe Allen had a telephone conversation with SEAWORLD Executive Steven Glashower, Vice President of Creative Engineering and Development, who stated: (1) SEAWORLD recalled REVERE's Works from the Second Presentation; (2) SEAWORLD had REVERE's contact information; and (3) he would contact REVERE when SEAWORLD was ready to proceed.

96.    REVERE relied upon SEAWORLD's representations in the SEAWORLD Letter as to the ongoing business relationship, and REVERE

continued to reasonably expect to execute an agreement with SEAWORLD to develop and pay for Australian Extremes.

## REVERE'S THIRD AGREEMENT WITH, AND PRESENTATION TO, SEAWORLD

97.    As part of their continuing course of dealings and business relationship, and their agreement to "collaborate on future attraction projects," REVERE contacted SEAWORLD to submit additional ideas and trade secrets to SEAWORLD for its theme parks.

98.    Like the Second Presentation, SEAWORLD and REVERE agreed to confidentiality and a new non-disclosure agreement and entered a Non-Confidentiality Agreement. REVERE once again corresponded with SEAWORLD Executive Steve Frein, Vice President of Planning and Development, to confirm the terms of the Third Presentation.

99.    SEAWORLD Executive Steve Frein emailed REVERE, on or about October 22, 2007, with an "updated confidentiality agreement for the upcoming meeting with Jim [Atchison]," a true and correct copy of which is attached and incorporated hereto as **Exhibit "G."**

100.  In advance of REVERE's Third Presentation to SEAWORLD executives, REVERE and SEAWORLD entered into a "Non-Confidentiality Agreement" dated October 26, 2007 (hereinafter, the "Second Agreement"), a true and correct copy of which is attached and incorporated hereto as

**Exhibit "H."**  The Second Agreement was prepared by BEC and signed by REVERE; BEC did not have a signature block.

101.   The terms of the Second Agreement were the same as those in the Agreement.  The Agreement applied to BEC, "its parents, its subsidiaries and affiliates," and parties to the Agreement or "their respective successors or assigns" have rights and obligations under the Agreement.  *See* **Exhibit "H."**

102.  On or about December 14, 2007, REVERE gave a third presentation to SEAWORLD at SEAWORLD's offices (hereinafter the "Third Presentation") regarding other creative concepts in addition to Australian Extremes, specifically "Edward's Exploration Factory."

103.  Present on behalf of SEAWORLD were four to five SEAWORLD Executives, including, Jim Atchison, Dan Brown, and Joe Couceiro, Chief Marketing Officer.

104.  During the Third Presentation, SEAWORLD President Jim Atchison introduced REVERE Team Member Greg Hill as having previously provided the Works for Australian Extremes to SEAWORLD in the Second Presentation.

105.  At the conclusion of the Third Presentation, SEAWORLD President Jim Atchison stated SEAWORLD was not interested in pursuing

the Edward's Exploration Factory project.

106. At no time during the Third Presentation did SEAWORLD President Jim Atchison disclose to REVERE that SEAWORLD was already using and exploiting REVERE's Works.

107. SEAWORLD President Jim Atchison stated that SEAWORLD had developed a new attraction called Aquatica and offered REVERE free passes to the grand opening of Aquatica in Orlando. REVERE would later learn that Aquatica contained elements and ideas taken from REVERE's Works.

## THE CONFIDENTIAL, TRUSTING BUSINESS RELATIONSHIP

108. SEAWORLD's relationship with REVERE was one of trust and confidence as parties engaged in a confidential business relationship, as evidenced by:

a) REVERE's sharing of confidential Works and trade secrets based upon SEAWORLD's promises;

b) The modifications to the Agreement before, during and after the Second Presentation;

c) The agreements as to additional terms to the Agreement before, during, and after the Second Presentation;

d)     REVERE's trusting SEAWORLD's representations that it would keep REVERE's proprietary information secret;

e)     SEAWORLD's confirming to REVERE in the SEAWORLD Letter the ongoing business relationship with REVERE in the future;

f)     REVERE continued the ongoing business relationship by coming back to SEAWORLD for the Third Presentation;

g)     REVERE trusted SEAWORLD would pay them for the Works and/or partner with REVERE to develop, design, and execute the Australian theme park from the Works; and

h)     Counsel from SEAWORLD's written confirmations that REVERE could trust SEAWORLD and that REVERE's Works were protected.

109.   REVERE agreed to nonconfidentiality only as to the limited universe of people within SEAWORLD who would necessarily need to see the Works to proceed with the Business Plan and prepare the agreement for payment. The relationship between REVERE and SEAWORLD was one of trust and confidence independent of the Agreement.

## SEAWORLD USES, BUILDS, AND EXPLOITS REVERE'S WORKS IN SEAWORLD ORLANDO, SAN DIEGO, AND SAN ANTONIO WITHOUT COMPENSATION TO REVERE

110.   Beginning in and around 2006, SEAWORLD began a pattern of

wrongful exploitation of numerous elements of REVERE's Works, creative concept, and Business Plan, including, without limitation, theme park and attraction design, development, trademark registration, and advertising.

111.   A comparison of elements, individually and in combination, in REVERE's Works and those utilized by SEAWORLD demonstrates that SEAWORLD copied and/or were affected or influenced by REVERE's Works, "products, ideas, and materials" (*see* **Exhibit "A"**, Agreement ¶ preamble and 1-4) without permission or payment and wrongfully appropriated and exploited the Works and Business Plan for SEAWORLD's own benefit. Further, the conceptual similarities demonstrate SEAWORLD's exploitation of REVERE's Works and Business Plan without permission or payment. SEAWORLD used, copied, and/or was influenced or affected by REVERE's "products, ideas, and materials" (*see* **Exhibit "A"**, Agreement ¶ preamble and 1-4).

### Merry-Go-Fish / Sea Carousel

112.   REVERE created, designed, and presented an attraction called "Merry-Go-Fish," which was a carousel featuring various sea creatures as ride vehicles, including but not limited to hammerhead sharks, seahorses, dugongs (in the manatee family), dolphins, whales, seals, and tropical fish. These concepts were new to SEAWORLD and had economic value for

SEAWORLD and REVERE disclosed this confidential idea in its Works to

SEAWORLD at the Second Presentation.



113.   After REVERE's First and Second Presentations, on or about

May 26, 2007, SEAWORLD opened the "Sea Carousel" at Shamu's Happy

Harbor in SeaWorld Orlando, which was a similar carousel featuring various

sea creatures as ride vehicles, including but not limited to hammerhead

sharks, seahorses, manatees, dolphins, and tropical fish. Comparisons of

REVERE's "Merry-Go-Fish" and SEAWORLD's "Sea Carousel" are

attached and incorporated hereto as **Composite Exhibit "I."**

114.   SEAWORLD's "Sea Carousel" features six (6) of the same animals as ride vehicles as REVERE's sea carousel and numerous design and structural elements as REVERE's sea carousel, to wit:

| | **REVERE's "Merry-Go-Fish"** | **SEAWORLD's "Sea Carousel"** | **Similarities** |
|---|---|---|---|
| Ride Vehicles | hammerhead and great white shark characters | hammerhead shark character | similar in body position, design, color, and essence |
| | seahorse characters with coral at the base | seahorse character with coral at the base | similar in color, shape, and design |
| | dugong—a marine mammal related to the manatee | manatee character | similar in color, shape, and essence |
| | dolphin and whale characters | dolphin character | similar in color and body position |
| | seal characters | sea otter character | similar in color, shape, and essence |

|  | REVERE's "Merry-Go-Fish" | SEAWORLD's "Sea Carousel" | Similarities |
|---|---|---|---|
|  | tropical fish characters | tropical fish characters | similar color tones and shapes |
| Design / Structural Elements | swirl wave design in shades of blue on the center structure which the ride vehicles circle<br><br>REVERE's RGB[5] values are: 84-161-181, 107-212-254, 53-119-180 | swirl wave design in shades of blue on the center structure which the ride vehicles circle<br><br>SEAWORLD's RGB values are: 69-164-188, 107-211-224, 2-119-196 | similar in location, function, shades of blue, and RGB values |
|  | orange coral adorning the top of the carousel ride<br><br>REVERE's RGB value: 231-135-53 | orange coral adorning the carousel ride as well as the signs SEAWORLD's RGB value: 231-135-59 | similar in shape, color, essence, and an almost identical RGB value |
|  | orange support beams (sweeps) on the underneath of the ride's roof | orange support beams (sweeps) on the underneath of the ride's roof | similar in shape, purpose, and color |

---

[5] The RGB number describes a color model where red, green, and blue colors are added and combined in various amounts, producing a vast spectrum of colors. Each of the RGB components can have a value ranging from 0 to 255, creating approximately 16 million different colors.

| | REVERE's "Merry-Go-Fish" | SEAWORLD's "Sea Carousel" | Similarities |
|---|---|---|---|
| | unique swirl wave design element | swirl wave design on the ride and signage | similar in shape, tone, purpose, and essence |

*See* **Composite Exhibit "I."**

**EmOcean / A'Lure, The Call of the Ocean**

115.   REVERE created, designed and presented a Cirque du Soleil style production titled "EmOcean" in which a daughter of the ocean falls in love with a son of the land.  REVERE's set and stage design used an ocean-like background with coral rock framing the stage and the performers using tapestry, rings, acrobatics, and mist.

116.   On or about October 4, 2008, as seen below, in 2008, SEAWORLD opened a similar Cirque du Soleil style production titled, "A'lure, The Call of the Ocean" in which a sea siren (a daughter of the ocean) falls in love with a fisherman (a son of the land).  SEAWORLD's set and stage design include a similar ocean-like background with coral rock framing the stage and the performers using tapestry, rings, acrobatics, and mist in the same color schemes. Comparisons of REVERE's show and SEAWORLD's show are attached and incorporated hereto as **Composite Exhibit "J."**



117.   REVERE created, designed, and presented sea animal puppet-like parade characters on extension poles – including a seahorse – held by people to perform in "The Great Barrier Reef" land in the Aussie Wilds park.   In 2008, SEAWORLD opened a Cirque du Soleil style production titled, "A'lure, The Call of the Ocean" in which a large seahorse puppet on extension poles held by performers is paraded around the stage and into the audience.   *See* **Composite Exhibit "J."**



EmOcean
Aussie Wilds theme park
Copyright 2006

A'lure, The Call of The Ocean
Opened January 2008

### **Manta Whirl / Manta**

118.   REVERE created, designed and presented their Aussie Wilds park including the rides "Manta Whirl" where the park patrons ride in a manta ray vehicle, a rollercoaster attraction called "Escape" where riders face both the ground and the sky throughout the ride while seated in 4-passenger rows, and a dark ride combined with a sea life exhibit called "Defenders of the Deep" where park patrons come face to face with ocean wildlife.

119.   On or about March 12, 2008, SEAWORLD filed a trademark for "Manta." On or about April 2, 2008, SEAWORLD announced the Manta

rollercoaster to be built at SeaWorld Orlando.  On or about May 22, 2009, SEAWORLD opened "Manta," which is a multi-faceted attraction where park patrons ride in a manta ray vehicle facing both the ground and the sky throughout the ride in 4-passenger rows, as well as a sea life exhibit/aquarium where park patrons come face to face with ocean wildlife. Comparisons of REVERE's attractions and SEAWORLD's "Manta" are attached and incorporated hereto as **Composite Exhibit "K."**

120.   SEAWORLD has advertised Manta by making the following public statements which endorse SEAWORLD's access to and copying of REVERE's Works:

a)   "Rebranding and tweaking the SEAWORLD Parks has been an ongoing process for BEC.  Essentially, it is a process of mixing rides and fish, or if you prefer, the integration of rides and animal exhibits;"

b)   "The Manta concept was largely the vision of Jumana Brodersen, and the project was her final one with BEC, where she was director of product development prior to launching her own company in 2008. David and Linda Smith, who contributed their marketing and product wisdom to Manta, are likewise both former BEC execs who became independent in

2008;" and

c)      "Brodersen and the Smiths all played instrumental roles in the Busch parks' coming into their own as uniquely branded attractions."[6]

121.   In addition, in 2011, SEAWORLD released concept art for the new attraction "Manta" to be constructed in SeaWorld San Diego with plans to open in 2012.  SEAWORLD's "Manta" coaster in San Diego will feature a rollercoaster in which park patrons appear to sit two across on top of a similarly designed and colored manta ray.  *See* **Composite Exhibit "K."**

122.   REVERE created, designed, and presented a fishing village surrounded by water.  The building structures were designed with green, curved roofs with tall, wooden pole supports and railings. Water and boulder rocks were below the buildings and walkways.   In 2011, SEAWORLD released concept art for the new "Manta" attraction to be built at SeaWorld San Diego.   SEAWORLD's designs include a building structure with a green, curved roof with tall, wooden pole supports and railings.  Water and boulder rocks are also shown below the building and walkways.  *See* **Composite Exhibit "K."**

123.   REVERE created, designed, and presented an attraction named

_____

[6] www.blooloop.com, "Theme Parks: Fun for Mom at Manta."

"Kangaroo Island," which included a towering rock formation with trees on top and plants growing along the sides. Park patrons had access to walkways at various levels of the rock formation with a ground level path that travels between two boulder rock formations.   In 2011, SEAWORLD released concept art for the new attraction "Manta" to be built at SeaWorld San Diego.  The art for the new "Manta" coaster shows the track going around a towering rock formation with trees on top and plants growing along the sides. Park patrons will have access to walkways at various levels of the rock formation with a ground level path that travels between two boulder rock formations.  *See* **Composite Exhibit "K."**

### Clam Shell / Sea Grass / Deep Sea Fish

REVERE's "Merry-Go-Fish" included an image of a father figure and a young child riding together in a pink clam shell. As seen below, on or about April 8, 2010, SEAWORLD uploaded a video on a website that included a logo for the new Shamu's Happy Harbor kid's play area.  SEAWORLD's logo incorporates an image of a father figure and a young child riding together in a similar pink clam shell.  *See* **Composite Exhibit "L."**




124.   REVERE's "Merry-Go-Fish" included elegantly growing sea grass with six visible, vertical blades of grass.   In 2008, SEAWORLD opened a new show, "A'lure, The Call of the Ocean," which is performed in the Nautilus Theater.   As seen below, outside, the sign for the show is comprised of six visible, vertical blades of sea grass similar to REVERE's in shape, size, color scheme, proportion and height.   *See* **Composite Exhibit "L."**





125.   REVERE created, designed and presented an attraction called, "Defenders of the Deep" in which an octopus with red eyes (uncommon for the species) sat atop the structure with its tentacles extending downward across the structure.  SEAWORLD's "Sea Carousel" has an octopus with red eyes adorning sitting atop the carousel with its tentacles extending across the top of the structure.  *See* **Composite Exhibit "L."**

126.   REVERE created, designed and presented a structure modeled after a deep sea angler fish sitting near its attraction, "Defenders of the Deep."  REVERE's deep sea angler fish had a large head, large teeth, and bulging blue eyes, which color is uncommon to the species.  In 2007,

SEAWORLD included a deep sea angler fish as a ride vehicle for their "Sea Carousel" as well as on the signage for their "Deep Sea Diner" game with a similar large head, large teeth, and bulging blue eyes (which color is uncommon to the species). *See* **Composite Exhibit "L."**

### Octopus / Design Elements

127. REVERE created, designed and presented an octopus character for its carousel, the "Merry-Go-Fish." The octopus was illustrated in an orangey-red color scheme with sporadic shading of lights and darks, oval-shaped spots on its head, and five legs showing. In 2007, SEAWORLD's redesign of Shamu's Happy Harbor included an octopus character on the sign for the "Sea Carousel" as well as throughout the area on different game stations. SEAWORLD's octopus character also has an orangey-red color scheme with sporadic shading of lights and darks, oval-shaped spots on its head, and five legs showing. Comparisons of REVERE's designs and SEAWORLD's designs are attached and incorporated hereto as **Composite Exhibit "M."**

128. REVERE created, designed and presented wave-shaped fences throughout "The Great Barrier Reef" land of the Aussie Wilds park within Australian Extremes to project the image and feel of water and wave-like movement. In 2009, SEAWORLD built similar wave-shaped fences

surrounding the new ride and sea life exhibit, "Manta," to simulate the wave motion. *See* **Composite Exhibit "M."**

129.   REVERE's "Defenders of the Deep" attraction was decorated with a wavy pattern in shades of light blue, dark blue and light green on the front of the structure. As seen below, SEAWORLD built carnival-type game booths at SeaWorld Orlando with a wavy pattern in shades of light blue, dark blue and light green.  *See* **Composite Exhibit "M."**



130.   REVERE created, designed and presented the land "The Great

Barrier Reef" within the Aussie Wilds park that was designed with a distinct swirl design covering the entire ground in this section of the park in a color scheme of blues, greens, and purples.  The swirl design is the most utilized design element in REVERE's entire destination resort, Australian Extremes. Subsequent to REVERE's Second Presentation, SEAWORLD began utilizing a similar swirl design on the ground in various places throughout the parks, including outside the show, "A'lure, The Call of the Ocean" and inside the aquarium section of the "Manta" attraction, where swirls are found on the ground in a similar color scheme of blues, greens, and purples. *See* **Composite Exhibit "M."**

### Discovery Bay / Bay of Play

131.   REVERE created, designed and presented a children's water play area called "Discovery Bay" in its water park, Billabong Beach, which included a large ship children can play on.  On or about August 10, 2007, SEAWORLD filed a trademark for "Bay of Play."  In 2008, SEAWORLD built "Sesame Street: Bay of Play" at SEAWORLD San Diego featuring a large ship children can play on.  SEAWORLD is scheduled to open Another "Bay of Play" at SeaWorld San Antonio in the spring of 2011.  *See* **Composite Exhibit "N."**

**SEAWORLD USES, BUILDS, AND EXPLOITS REVERE'S WORKS
FOR WORLDS OF DISCOVERY DUBAI
WITHOUT COMPENSATION TO REVERE**

132.   REVERE's Australian Extremes destination resort was created, designed and presented as a new them park adventure, with a central layout of theme parks built adjacent to one another and immediate access to dining, shopping, hotel accommodations and other entertainment venues. REVERE's Australian Extremes destination resort consisted of five (5) main components: a ride and animal park, a water park, an entertainment complex, a hotel, and a golf course. These designs were in the Works presented to SEAWORLD.

133.   In REVERE's destination resort, REVERE developed a concept of a golf course with a large sea creature – a great white shark – that could be seen from the sky. The large shark had water traps around its body to give the further appearance of a shark in the ocean. At the First and Second Presentations, REVERE presented to SEAWORLD the idea that the iconic great white shark image could be a new and additional iconic symbol to SEAWORLD's iconic killer whale image such that SEAWORLD would expand its marketing image to include the great white shark.  REVERE's use of an iconic great white shark symbol was designed to give the destination resort a unique identity and coincided with REVERE's idea for

SEAWORLD to have a great white shark in captivity as well as killer whales in captivity. Andrews specifically discussed and approved this idea and asked REVERE to research its feasibility.

134.   On or about June 5, 2007, SEAWORLD filed trademarks for "Worlds of Discovery Parks" and "Worlds of Discovery."   On or about February 28, 2008, SEAWORLD issued a press release announcing "Worlds of Discovery Dubai" as a joint venture with Nakheel PJSC to build a destination resort located on an island in Dubai.   Like REVERE's destination resort, SEAWORLD's destination resort was designed to include five (5) main components with theme parks built adjacent to one another with immediate access to dining, shopping, hotel accommodations and other entertainment venues. Comparisons of REVERE's Australian Extremes destination resort and SEAWORLD's "Worlds of Discovery" destination resort are attached and incorporated hereto as **Composite Exhibit "O."**

135.   SEAWORLD's island in Dubai was designed in the shape of their iconic killer whale, which could be seen from the sky.  Instead of using the great white shark as an aerial image to give the destination resort a unique identity, SEAWORLD substituted the killer whale shape to similarly give the appearance of a sea creature in the ocean.  *See* **Composite Exhibit "O."**







136.   The website for the property developer, Nakheel PJSC,[7] states

that "Worlds of Discovery in Dubai will be designed and managed by BEC."

Never in the approximate twenty (20) years BEC owned and operated

SEAWORLD did BEC endeavor to develop and build a multi-park

destination resort until after REVERE's First and Second Presentations.

137.   SEAWORLD publicly announced a business plan which was

copied from REVERE's Business Plan presented to SEAWORLD and

---

[7] http://www.nakheel.com/en/news/worlds_of_discovery

stated: "We challenged ourselves to stand apart from Western-based theme parks and enrich these new properties with storylines and themes that would transcend cultures.  We then crafted a high concept and narrative that would become the organizing principle for what would be built, so that from the moment the first sketches were rendered, the vision was clear."[8]

138.   REVERE created, designed and presented several towering, cylindrical buildings located in the Australian Extremes resort, including a ride called "Tasmanian Tiger" that wraps around a unique rock formation. In 2008, SEAWORLD presented a scale model of the planned "Worlds of Discovery" resort in Dubai which showed several similar towering, cylindrical buildings as well as a similar large rock formation that incorporates an attraction weaving throughout the large boulders. *See* **Composite Exhibit "O."**

139.   REVERE created, designed and presented a destination resort made up of five (5) components, including an entertainment venue called "Sydney Harbor Entertainment" with shopping, dining, and other entertainment experiences.  "Sydney Harbor Entertainment" featured a very tall tower structure in the center of the area that was the tallest structure in the entire Australian Extremes resort.  In 2008, SEAWORLD presented a

---

[8] http://www.smithinkusa.com/

scale model of the planned "Worlds of Discovery" resort in Dubai showing an entertainment complex geographically located in the same area as REVERE's. In addition, SEAWORLD's entertainment complex also featured a very tall tower structure in the center that was the tallest structure in the entire resort. *See* **Composite Exhibit "O."**

**SEAWORLD USES, BUILDS, AND EXPLOITS REVERE'S WORKS
FOR BUSCH GARDENS TAMPA
WITHOUT COMPENSATION TO REVERE**

140.   In 2006, "Busch Gardens Tampa" was re-named "Busch Gardens Africa" to identify and capture the predominately African theme of the park.

141.   After REVERE's First and Second Presentations, on or about March 19, 2007, SEAWORLD filed a trademark for "Jungala."  On or about September 6, 2007, SEAWORLD issued a press release on the new area, "Jungala" at Busch Gardens.  On or about April 5, 2008, the Jungala area opened at Busch Gardens.

142.   In 2008, "Busch Gardens Africa" was changed back to "Busch Gardens Tampa."

**Bridge to Adventure / Bridge in Jungala**

143.   REVERE created, designed and presented a "Bridge to Adventure" in "The Outback" area of Aussie Wilds.  This bridge connected

two areas and featured ropes above the railings, curved canyons below, staggered platform rocks, and erosion in the rocks throughout the area. This area also featured several waterfalls. REVERE created, designed and presented a river raft ride called "Craig and Lyles Crocodile River Excursion" that went under the "Bridge to Adventure" where park patrons could ride the rapids and encounter crocodiles, emus, dingoes and camels as they traveled along through canyons.

144.   In 2008, SEAWORLD opened a new area in Busch Gardens called "Jungala," describing it as its newest and most ambitious park enhancement project to date.  "Jungala" features a large bridge connecting two areas and uses ropes on the bridge above the railings, curved canyons below, staggered platform rocks, erosion in the rocks throughout the area and several waterfalls. In "Jungala," tigers live in the canyons below the bridge that patrons can experience as they walk through the canyons.  The canyon curves and erosion follow the same curves and patterns as REVERE's "Bridge to Adventure."  Comparisons of REVERE's "Bridge to Adventure" and SEAWORLD's "Bridge to Jungala" are attached and incorporated hereto as **Composite Exhibit "P."**




145.   REVERE created, designed and presented an area at the water park, Billabong Beach, called "Mudslide Falls" featuring a mudslide theme that evoked extensive erosion throughout the attraction. In 2008, SEAWORLD opened the new "Jungala" area in Busch Gardens that features a large tiger exhibit where water spills over the terrain, roots are revealed, trees are toppled over, and the appearance of mud washing away creates extensive erosion.  *See* **Composite Exhibit "P."**

**Inferno Fighters / Jungle Flyers**

146.   REVERE created, designed and presented a section of their water park Billabong Beach devoted to aviation that includes a hang-glider ride called "Inferno Fighters." In 2008, SEAWORLD opened the hang-glider ride, "Jungle Flyers" within the new land "Jungala" at Busch Gardens. *See* **Composite Exhibit "Q."**

**Australian Way / Walkabout Way**

147.   REVERE created, designed and presented an entire section of the Aussie Wilds park that was dedicated to a traditional zoo-like atmosphere featuring a variety of Australian animals, including kangaroos, wallabies, and kookaburras.   The street that runs down the middle of this section was called "Australian Way" and was surrounded by animal exhibits.

148.   On or about March 10, 2010, SEAWORLD filed trademarks for the Australian-themed "The Kookabura's Nest" and "Kangaloom."   On or about March 19, 2009, SEAWORLD filed a trademark for the Australian-themed "Walkabout Way."

149.   On or about June 14, 2010, SEAWORLD opened a new section in Busch Gardens called "Walkabout Way" which is an Australian-themed zoo-like area that includes an area called "Kangaloom" where park patrons can pet and feed kangaroos and wallabies.   "Walkabout Way" also includes an aviary called "The Kookaburra's Nest" that houses a variety of birds, including several native to Australia. Comparisons of REVERE's "Australian Way" and SEAWORLD's "Walkabout Way" are attached and incorporated hereto as **Composite Exhibit "R."**

150.   In the Books provided by REVERE to SEAWORLD executives in 2006, REVERE described their "Australian Way" as a place where park

patrons can take a stroll while they are surrounded by animals native to Australia.  SEAWORLD's new "Walkabout Way" area allows park patrons to stroll along the "way" enjoying Australian animals in the predominately African-themed park, Busch Gardens. *See* **Composite Exhibit "R."**

151.   REVERE created, designed and presented a logo for Aussie Wilds with a kangaroo decorated in aboriginal designs including triangle-shaped designs on the body, circles with dots on the inside of the legs, minimally decorated shoulders, and circle with dots inside on the body.  In 2010, SEAWORLD opened "Kangaloom" inside the section "Walkabout Way" within Busch Gardens.  On the doors leading into "Kangaloom" where guests can pet and feed kangaroos, there is a painting of a kangaroo with similar design elements. *See* **Composite Exhibit "R."**

152.   REVERE created, designed and presented the name "Tucker" on the signage atop a quick bite type eatery, with a metal corrugated roof, serving counters open to the exterior, and entrance ways on one end.  In 2010, SEAWORLD opened the "Kangaloom" area inside the section, "Walkabout Way" within Busch Gardens where guests can pet and feed kangaroos and wallabies.  SEAWORLD uses the name "Tuckerbox" above their kangaroo food service counter.  "Kangaloom" has a metal corrugated roof, serving counters open to the exterior, and entrance ways on one end.

*See* **Composite Exhibit "R."**

### Parade Characters / Decorative Poles / Rock Formations

153.   REVERE created, designed and presented parade characters that were controlled by extension poles held by performers and had accordion-like bodies with ribbed seams throughout all their structures.  One of the main characters had a large head piece with a shoulder decoration protruding outward.   In 2008, SEAWORLD introduced stilt walker characters in "Jungala" that were controlled by extension devices held by performers, with ribbed seams, a large head piece, and a decorative shoulder. Comparisons of REVERE's designs and SEAWORLD's designs are attached and incorporated hereto as **Composite Exhibit "S."**



154.   REVERE created, designed and presented ornamental antlers at the top of their poles as part of the attraction "Sonic Boomerang."  In 2008, see below, in the land "Jungala" at Busch Gardens, SEAWORLD built ornamental antlers at the tops of their poles all throughout the land.  *See* **Composite Exhibit "S."**



155.   REVERE created, designed and presented vertical poles near in proximity to each other, have different comparable heights and have distinct colored bands and tops.  In 2008, throughout the new land "Jungala" in

Busch Gardens, SEAWORLD built support poles that are similarly situated, stacked at different heights and with colored bands and tops. *See* **Composite Exhibit "S."**

156.   REVERE created, designed and presented triangular-shaped banners as part of the high-speed coaster, "Sonic Boomerang." These banners had patterns of unique expressions of the wild and were supported by leaning, decoratively wrapped poles as part of the ride entrance and queue lines. In 2010, SEAWORLD announced a new roller coaster, "Cheetah Hunt," to be built at Busch Gardens in the spring of 2011. The concept drawings show several triangular-shaped banners throughout the attraction as well as at the entrance and queue lines. The patterns on SEAWORLD's banners have unique expressions of the wild and are supported by leaning, decoratively wrapped poles. *See* **Composite Exhibit "S."**

157.   REVERE created, designed and presented rock formations in the shape of animals, purposely designed to be subtle in appearance. In 2008, SEAWORLD constructed animals out of rock formations in the new land, "Jungala" at Busch Gardens, purposely designed to be subtle in appearance. *See* **Composite Exhibit "S."**

158.   REVERE created, designed and presented tall boulder rocks

that shoot out water.  These rocks had horizontal lines cut into the sides.  At the end of the row of boulder rocks, there was a spherical painted feature on the ground.  In 2008, SEAWORLD constructed tall boulder rocks that shoot out water in a play area for kids in the "Jungala" land of Busch Gardens. These rocks have horizontal lines cut into the sides, and a spherical painted feature is found on the ground in this water play area.  *See* **Composite Exhibit "S."**

159.   REVERE created, designed and presented waterfalls with large cliff-like rocks beside the "Bridge to Adventure."  In 2008, SEAWORLD constructed similar waterfalls with large cliff-like rocks in the land, "Jungala" at Busch Gardens.  *See* **Composite Exhibit "S."**

160.   REVERE created, designed, and presented an attraction named "Kangaroo Island," which included a multi-story, towering rock formation with multiple cave openings and walkways.   In 2008, SEAWORLD constructed a similar multi-story, towering rock formation with multiple cave openings and walkways. *See* **Composite Exhibit "S."**

## Logo Designs / Concept Art

161.   REVERE created, designed and presented a logo for its "Kalbarri Bay" golf course with a green, oval-shaped design with the image of a grouping of leaves. REVERE created, designed and presented an

additional leaf-shaped sign in Sydney Harbor Entertainment. In 2008, SEAWORLD created a logo for its new land "Jungala" in Busch Gardens with a green, oval-shaped leaf design. *See* **Composite Exhibit "T."**

162.   REVERE created, designed and presented an attraction where a tree was entangled with multiple structures, where guests can enter through tree trunks, where the rooftops lean, and where the shingles of the roofs are in a diamond pattern. In 2010, Jumana Brodersen's company, JCo, produced and released concept art depicting an attraction with a tree entangled with multiple structures, where guests enter through tree trunks, where the rooftops lean, and where the shingles of the roofs are in a diamond pattern. Jumana Brodersen was the Corporate Director of Creative Development at BEC and led the creative team during the creation of "Jungala" at Busch Gardens. *See* **Composite Exhibit "T."**

163.   REVERE created, designed and presented "Dynamite Pass," a coaster ride with a drop within a tall tower. REVERE designed the buildings side by side with an old west theme, focusing on the Australian gold rush during the 1800s. REVERE used motif items such as wooden barrels, multiple structures and towering rock formations to express the scene.  In 2008, Scott C. Neale, contract designer for SEAWORLD, created and produced an illustrated concept art of "Dynamite Drop" using a similar

number of structures, side by side buildings, a tall tower, and barrels in an old west theme.  *See* **Composite Exhibit "T."**

## SEAWORLD USES, BUILDS, AND EXPLOITS REVERE'S WORKS FOR AQUATICA WITHOUT COMPENSATION TO REVERE

164.   Prior to REVERE's First and Second Presentations, on or about July 15, 2005, SEAWORLD announced plans to build a "natural" water park in Orlando, Florida. Shortly thereafter, on or about September 15, 2005, SEAWORLD filed a trademark for "Aquatica."

165.   Then, after the Second Presentation, on or about March 5, 2007, SEAWORLD announced the name "Aquatica" but changed the theme from a "natural" park to the South Seas/Australian theme for SEAWORLD's water park.

166.   On or about June 26, 2007, SEAWORLD filed trademarks for the following Australian-themed names for Aquatica: "HooRoo Run", "Whanau Way", "Roa's Rapids", "Kata's Kookabura Cove", "Beachies", "Sunnies n Such" and "Taumata Racer". On or about June 27, 2007, SEAWORLD filed a trademark for "Slippity Dippity."  REVERE created, designed and presented a water slide in Billabong Beach called "Slick Sliding Away."

167.   On or about March 1, 2008, Aquatica SEAWORLD's water

park opened to the public.

168.   Upon information and belief, REVERE alleges that under the direction of Jim Atchison, Steven Glashower, and Jumana Brodersen and after the First and Second Presentations, SEAWORLD developed Aquatica into the Australian themed water park.

169.   SEAWORLD, without permission or payment, incorporated into Aquatica confidential ideas, concepts, designs, and trade secrets contained in REVERE's Works that were disclosed to SEAWORLD in confidence.

### Wave Pools / Boulders / Trees

170.   REVERE created, designed and presented a unique wave pool, "Bondi Beach Surf Pool," made of boulder rocks and a recessed rock area jutting out from the rock wall where the waves originate. In 2008, SEAWORLD opened the new water park, Aquatica, with a wave pool, "Cutback Cove," made up of boulder rocks and includes a recessed rock area jutting out from the rock wall where the waves originate. Comparisons of REVERE's water park and SEAWORLD's water park are attached and incorporated hereto as **Composite Exhibit "U."**

171.   For the surf pool at Billabong Beach, REVERE created, designed and presented three distinct sections of palm trees and plants

centrally located in front of the beach chairs in front of the wave pools.  In 2008, SEAWORLD built the water park, Aquatica, with three distinct areas of palm trees and plants located in front of the beach chairs in front of the wave pools. *See* **Composite Exhibit "U."**

172.   REVERE created, designed and presented boulder rocks surrounding the wave pool with a particular layering direction, as well as boulder rocks on the beach area.  In 2008, SEAWORLD built the water park, Aquatica, with boulder rocks in the wave pool with a similar layering direction, which can also be found on the beach area.  The rocks in both parks' wave pools are similar in color, angle, effect, and assembly.  *See* **Composite Exhibit "U."**

173.   REVERE created, designed and presented trees that were to appear as if they had fallen over in a mudslide and created an element for park patrons to go underneath the fallen trees while in the water.  In 2008, SEAWORLD built the water park, Aquatica, with toppled trees lying across the lazy rivers, where park patrons can travel underneath.  *See* **Composite Exhibit "U."**

## Decorative Design Features

174.   REVERE created, designed and presented a beverage kiosk named "H20" in "The Great Barrier Reef" area of Aussie Wilds that was

designed with multiple circles on the base.  In 2008, SEAWORLD built kiosks in their new water park, Aquatica, that are designed with multiple circles on the base. Comparisons of REVERE's designs and SEAWORLD's designs are attached and incorporated hereto as **Composite Exhibit "V."**

175.   REVERE created, designed and presented distinct sun designs with a circle line on an outer edge, an off-centered oval-shaped core, and flames protruding outward with dimensional color.  In 2008, SEAWORLD opened their new water park, Aquatica, with a distinct sun design found throughout the park.  SEAWORLD's sun design features a circle line on an outer edge, an off-centered oval-shaped core, and flames protruding outward with dimensional color.  *See* **Composite Exhibit "V."**

176.   REVERE created, designed and presented character totem poles to be placed throughout the water park, Billabong Beach. In 2008, SEAWORLD released concept art showing a similar red character totem pole. *See* **Composite Exhibit "V."**

177.   REVERE created, designed and presented small sketches of animals, such as lizards and birds, on rocks based on Maori and Aboriginal art.  In 2008, SEAWORLD built the water park, Aquatica, with mascots such as lizards and birds decorated in Maori and Aboriginal-style art. *See* **Composite Exhibit "V."**

178.   REVERE created, designed and presented several different kinds of banners, including downward pointing triangular-shaped flags with vertical stripes.  In 2008, SEAWORLD built the water park, Aquatica, with similar triangular-shaped flags with vertical stripes suspended from horizontal bars. *See* **Composite Exhibit "V."**

179.   REVERE created, designed and presented multiple pier poles tied together with rope and a tall, arched, metal light fixture coming from the top of the poles, as well as a water feature with a tall, arched, metal showerhead coming from a bathtub flowing water. In 2008, SEAWORLD built the water park, Aquatica, with similar multiple pier poles tied together with rope and a tall, arched metal showerhead coming out the top of the poles.  *See* **Composite Exhibit "V."**

### Buildings / Roof Designs

180.   REVERE created, designed and presented South Seas building designs for its water park, Billabong Beach, where the green roof tops have a leaning pitch.  In 2008, SEAWORLD built South Seas building structures for its water park, Aquatica, where the green roof tops have a similar leaning pitch. *See* **Composite Exhibit "W."**

181.   REVERE created, designed and presented the "Victoria Pointe" hotel with a high pitched roof with a crossing pattern on the front with

wooden siding.  In 2008, SEAWORLD built the water park, Aquatica, with a high pitched roof with a crossing pattern on the front with wooden siding. *See* **Composite Exhibit "W."**

182.   REVERE created, designed and presented the ride, "Tasmanian Tiger" at the Aussie Wilds park. The ride has a high pitched roof, open areas in the center and right, rock work, and a logo at the bottom of the roof.  In 2008, SEAWORLD built a restaurant at Aquatica with high pitched roofs, open areas in the center and right, rock work, and a logo at the bottom of the roof.  *See* **Composite Exhibit "W."**

183.   REVERE created, designed and presented an area called "Bondi Beach Surf Club" at the Billabong Beach water park.  The area is a surfer area overlooking the beach with a restaurant called "Lookout Cookout," where surfboards are hung high atop the building.  In 2008, SEAWORLD built the "Banana Beach Cook-out" restaurant at Aquatica with surf boards mounted atop the building.  *See* **Composite Exhibit "W."**

184.   REVERE created, designed and presented the "Boab Bar" located in a boab tree in the park Aussie Wilds.  The "Boab Bar" had paddles hanging on the railing, ropes holding support beams, Australian objects, and lantern-style lights, giving it an outdoor feel.  In 2008, SEAWORLD built the "Banana Beach Cook-out" restaurant at Aquatica

with paddles hanging on the wall, ropes holding support beams or Australian objects, and round lamp shades with large bulbs protruding downward, giving the restaurant an outdoor feel. *See* **Composite Exhibit "W."**

### Design Swirls

185.   REVERE created, designed and presented design swirls featured all throughout the Australian Extremes destination resort on the ground level as well as on various objects and attractions.   In 2007, SEAWORLD began to add similar design swirls throughout their parks on the ground level as well as on various objects and attractions. *See* **Composite Exhibit "X."**

### Australian Names

186.   REVERE created, designed and presented an Australian-themed destination resort using more than one hundred Australian names, words and phrases. In 2008, SEAWORLD began using Australian names and phrases in the water park, Aquatica, as well as in a new Australian-themed area in Busch Gardens. *See* **Composite Exhibit "Y."**

### Similarly Named and Purposed Attractions

187.   After REVERE's First and Second Presentations, SEAWORLD began to build various new attractions with similar names and functions as those of REVERE, to wit:

| **REVERE** | **SEAWORLD** |
|---|---|
| "Manta Whirl" | "Manta" |
| waterslide "Goo-Roo" | waterslide "HooRoo Run" |
| water park restaurant "Lookout Cookout" | water park restaurant, "Banana Beach Cook-out" |
| logo "Aussie Wilds" | logo "Wild Things" |
| attraction coaster "Dynamite Pass" | attraction "Dynamite Drop" |
| food and drink stand "Tucker" | kangaroo food stand "The Tuckerbox" |
| Cirque du Soleil style show "EmOcean" | Cirque du Soleil style show "A'lure, The Call of the Ocean" |
| wave pool "Bondi Beach Surf Pool" | wave pool "Big Surf Shores" |
| Australian-themed zoo-like area "Australian Way" | Australian-themed zoo-like area "Walkabout Way" |

*See* **Composite Exhibit "Z."**

## SMITHINK AND JCO EXPLOIT REVERE'S WORKS WITHOUT COMPENSATION TO REVERE

188.   Smithink's Chief Executive Officer, David Smith, was at the Second Presentation on behalf of SEAWORLD and had direct access to REVERE's Works, including REVERE's Books.

189.   JCo's Chief Executive Officer, Jumana Brodersen, was the Corporate Director for Creative Development of SEAWORLD and, upon

information and belief, had access to REVERE's Works.

190.   Both principal officers of Smithink and JCo were executives of SEAWORLD from the time of the Second Presentation in 2006 through 2008 and were involved in the creative design of SEAWORLD's theme parks and attractions.

191.   Upon information and belief, REVERE alleges that in approximately March 2008, both Smithink and JCo were formed as third party designers for SEAWORLD when SEAWORLD's headquarters moved from St. Louis, Missouri to Orlando, Florida.

192.   Upon information and belief, REVERE alleges that in addition to forming the new entities of Smithink and JCo, David Smith and Jumana Brodersen continued to work directly for and on behalf of SEAWORLD.

193.   Upon information and belief, REVERE alleges that for their work on a $40MM park expansion, both David Smith and Jumana Brodersen accepted awards for "Thea Award for Outstanding Achievement: New Theme Park Land" (hereinafter the "Award") on behalf of SEAWORLD for their work of Jungala in Busch Gardens Tampa, which copied elements contained in created by REVERE. In addition, Jim Atchison, Steven Glashower, and Brad Andrews were listed on the Award as contributors, all of which were present at the Second Presentation.

194.   Upon information and belief, REVERE alleges that David Smith of Smithink and formerly of SEAWORLD was also involved in the development, design, and promotion of SEAWORLD's Dubai – Worlds of Discovery, Manta of SeaWorld Orlando, Jungala of Busch Gardens Tampa, and A'lure, which copied elements contained in REVERE's Works presented to SEAWORLD.

195.   Upon information and belief, REVERE alleges that Jumana Brodersen of JCo and formerly of SEAWORLD was involved in the development, design, and promotion of Manta of SeaWorld Orlando, Jungala of Busch Gardens Tampa, Aquatica, and Bay of Play of SEAWORLD, which copied or were affected or influenced by elements contained in REVERE's Works presented to SEAWORLD.

196.   Upon information and belief, REVERE alleges that Jumana Brodersen of JCo, as Corporate Director for Creative Development of SEAWORLD was responsible for coordinating with numerous other designers/contractors, such as Suzanne Sessions, Inc., a Missouri corporation, Elaine Swanger Designs, LLC, a Missouri limited liability company, Sky's the Limit International, LLC, a Missouri limited liability company, and Wharton-Smith, Inc., a Florida corporation, which were involved in the design, development, and promotion of attractions which

copied or were affected or influenced by elements contained in REVERE's Works presented to SEAWORLD including, without limitation, Manta, Jungala, Bay of Play, Dubai "Worlds of Discovery", Sea Carousel, and concept art such as dynamite drop.

197.   Smithink and JCo were both personally and directly involved in SEAWORLD's tortious conduct and breaches of the Agreement.

198.   David Smith on behalf of Smithink and Jumana Brodersen on behalf of JCo misappropriated and disclosed REVERE's trade secrets and Works to their respective companies for personal profit.

199.   Smithink and JCo's misappropriation and copying of REVERE's Works have enhanced Smithink and JCo's good will and market recognition, and they have profited from such exploitation.

## SEAWORLD USES REVERE'S WORKS AND BUSINESS PLAN TO REDESIGN ITS PARKS

200.   After SEAWORLD received REVERE's Works and Business Plan, SEAWORLD used and/or was influenced or affected by REVERE's Works, "products, ideas, and materials" (*see* **Exhibit "A"**, Agreement ¶ preamble and 1-4) to redesign and revamp the themes of its parks, including, without limitation, Busch Gardens Tampa, SeaWorld Orlando, SeaWorld San Antonio, and Aquatica.

201.   SEAWORLD used and exploited REVERE's Business Plan and

Works incorporating REVERE's ideas, products, materials, designs, structures, shapes, colors, essence, expression, concepts, themes, words, visions, influence, experience, and the combination and pattern of elements.

202.   Upon information and belief, REVERE alleges that prior to the First and Second Presentations, SEAWORLD never used an Australian theme or the design elements found within the Works for any of its parks.

203.   Never in SEAWORLD's approximate 37 years of existence did SEAWORLD have a carousel based upon riding sea animals or having few rides where patrons ride on sea creatures.   REVERE's First and Second Presentations included two: a carousel of sea animals and an attraction where patrons ride a manta ray.   Afterwards, SEAWORLD executed both.

204.  Smithink's website touts that SEAWORLD:   ". . . united a multi-disciplinary team to undertake one of the most ambitious moves in SEAWORLD's history – to differentiate the brand by creating an experience that went beyond a theme park, beyond a zoo or aquarium, and instead, purposefully defined an entirely new space" and "[b]y thinking boldly, the SEAWORLD brand was revitalized, resulting in a significantly stronger brand image, an increase in attendance, and stronger financial performance."[9]

---

[9] http://www.smithinkusa.com/ideas

205.   SEAWORLD, Smithink, and JCo used REVERE's Works and Business Plan both directly and indirectly as a model, template, and inspiration to create the various SEAWORLD attractions detailed above.

206.   To the extent that SEAWORLD's attractions and theme park plans are dissimilar from REVERE's, such dissimilarity resulted from Defendants' calculated attempt to design around REVERE's Works for "deliberate non-copying." Such effort by Defendants to give appearance of dissimilarity is demonstrative of Defendants' copying.

207.   SEAWORLD's implementation of REVERE's Works and Business Plan into its parks brought value and financial benefit to Defendants and their parents, subsidiaries, affiliates, partners, and successors/assigns.

**SEAWORLD IGNORES REVERE'S ATTEMPTS TO DISCUSS SEAWORLD'S USE OF REVERE'S WORKS AND BUSINESS PLAN**

208.   On or about January 5, 2010, REVERE contacted SEAWORLD's President, Jim Atchison, to discuss SEAWORLD's use of REVERE's Works and the breach of the Agreement in hopes of resolving the apparent misappropriation. President Jim Atchison – in contrast to the cordial communication in which REVERE disclosed its Works – refused to even speak with REVERE's representatives. A SEAWORLD Executive, TG

Ganeshan (hereinafter "Ganeshan") contacted REVERE and stated he would discuss the matter with the SEAWORLD Executives present at the Second Presentation.

209. On or about January 19, 2010, REVERE again called SEAWORLD and was denied an opportunity to speak with Jim Atchison or to meet with the SEAWORLD Executives. Ganeshan told REVERE's agent that he spoke with all six (6) SEAWORLD Executives present at the Second Presentation and no one remembered REVERE or the Second Presentation. Additionally, Ganeshan advised REVERE that SEAWORLD does not create its own design and attraction elements in house but uses subcontractors for most of the design work and further stated that it was impossible for SEAWORLD to copy or steal REVERE's Works. Finally, Ganeshan told REVERE that SEAWORLD's position is ". . . we believe this is nothing more than extortion."

210. For SEAWORLD's own profit and advantage, SEAWORLD has misappropriated REVERE's Works without consent or payment in breach of the Agreement.

211. SEAWORLD's breaches of contract and misappropriation of REVERE's Works and Business Plan has enhanced SEAWORLD's good will and market recognition, and SEAWORLD has profited from the

enhanced good will, revenues, and market recognition in their ten (10) theme parks across the United States.

212.   In addition, SEAWORLD, JCo, and Smithink's actions have damaged REVERE's ability to sell the Works and Business Plan because Defendants already used or published the Works.

213.   SEAWORLD had a duty to disclose its use of the Works, but at no time did SEAWORLD advise REVERE that SEAWORLD was using REVERE's Works and Business Plan.

## REVERE'S DAMAGES

214.   Upon information and belief, REVERE alleges that as a direct and proximate cause of Defendants' wrongful conduct, all Defendants have realized and continue to realize profits and other benefits rightfully belonging to REVERE.

215.   As a direct and proximate consequence of Defendants' actions, REVERE has been harmed.

216.   REVERE suffered, and will continue to suffer, damages for Defendants' misappropriation and ongoing exploitation of REVERE's Works and Business Plan.

217.   As a result of Defendants' actions for the purpose of commercial advantage or private financial gain, REVERE was forced to

retain the law firm of Morgan & Morgan, P.A., agreeing to pay reasonable attorneys' fees for its legal services and costs.

218.   All conditions precedent to filing this action have been fulfilled or waived.

## COUNT I – BREACH OF CONTRACT AND DUTY OF GOOD FAITH AND FAIR DEALING AGAINST SEAWORLD

219.   This is an action by REVERE against SEAWORLD for damages that exceed $15,000.00 for breach of the Agreement.

220.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above.

221.   A valid contract exists between REVERE as the "Submitting Party" and SEAWORLD by virtue of the agreements, including, without limitation, the Agreement, and the amendments and modifications thereto, all of which contain an implied duty of good faith and fair dealing.

222.   The Agreement is binding upon BEC, "its parent, its subsidiaries and affiliates" and/or "their respective successors or assigns" who have rights and obligations under the Agreement (see **Exhibit "A"**, Agreement, introduction and ¶10).

223.   The Agreement provided, among other things, for the submission of REVERE's ideas.

224.   The Agreement includes, as a matter of law, any implied

negative covenant and/or promise which a reasonable person in the position of the REVERE would be justified in believing was included, and additional implied in fact terms resulting from the parties' representations and conduct. Such promises, covenants, and terms include:

(a)     SEAWORLD's duty to police the disclosure of the Works, to act in good faith regarding REVERE's interests, and to reasonably protect REVERE's rights in the Works;

(b)     SEAWORLD's promise to REVERE to adhere to the expressly agreed to limitations and restrictions upon the SEAWORLD's use of the Works;

(c)     SEAWORLD's duty to make reasonable disclosures to REVERE, and to not conceal facts and actions which affect, diminish, or destroy REVERE's rights, interests and opportunities related to the Works;

(d)     SEAWORLD's duty to disclose any opportunity, benefit, or compensation derived from the use of the Works;

(e)     SEAWORLD's promise to pay REVERE for any and all uses of the Works, due to a bilateral expectation of compensation, and a course of dealing requiring payment and permission;

(f)     SEAWORLD's duty to negotiate a fair market value with

REVERE for Work of use ideas and elements from the Works; and

(g)     SEAWORLD's duty to negotiate a fair market value with REVERE for use of ideas and elements from the Works.

225.   As a result of the Agreement and the conduct of the parties, SEAWORLD covenanted, expressly or by implication, not to undertake or permit the exploitation of the ideas, story, concepts, oral themes, characters contained in the Works and/or the titles therein, whether or not copyright protectable, without payment, or in a manner which would diminish or impair the value of the retained rights of REVERE in the Works.

226.   REVERE has performed its obligations under the Agreements, and all conditions precedent has occurred or has been performed, waived or otherwise satisfied.

227.   SEAWORLD breached the Agreement by:

a)     using the Works without reducing their use of REVERE's Works into a formal written contract whereby REVERE would be paid for SEAWORLD's use and exploitation of the Works in breach of Section 3 of the Agreement. At the Second Presentation, SEAWORLD's President, Mr. Kasen asked "where do I sign?" However, when REVERE called later to follow up and execute the formal written contract provided for in the Agreement, SEAWORLD

refused to do so;

b)      disclosing and disseminating REVERE's trade secrets to third parties beyond the agreed limits of those agreed to as necessary to vet Australian Extremes in breach of Sections 2-3 of the Agreement; and

c)      failing to pay REVERE for SEAWORLD's use of the Works and Business Plan (as defined in the Agreement as product, idea, and materials submitted by REVERE), the use of which was conditioned upon REVERE's express written agreement to be "expressed in a formal written contract" to provide payment and terms of use in breach of Sections 3 of the Agreement.

228.   SEAWORLD also breached the implied covenant of good faith and fair dealing in the Agreement by:

a)      using and exploiting REVERE's Works without compensating for the same;

b)      disseminating the Works to third parties for exploitation;

c)      failing to execute a contract with REVERE detailing payment for the Works; and

d)      representing to REVERE that their Works were protected.

229.   SEAWORLD is liable for their breaches of the Agreement and for their breaches of their implied duty of good faith and fair dealing, as well

as, for the actions by all the Defendants and other persons or entities which constitute agents or persons or entities authorized by SEAWORLD to exploit or assist in exploiting the works, including, but not limited to, licensees, distributors, third party service providers, and contractors.

230.   As a direct and proximate result of SEAWORLD's breaches, REVERE has suffered damages, which will continue to accrue each month.

231.   REVERE is entitled to an accounting and restitution to REVERE of all gains, profits and consideration in any form accruing to SEAWORLD, as well as other persons or entities authorized by SEAWORLD, derived from the exploitation of the Works, and of the allied and ancillary rights related thereto from SEAWORLD's breaches of the Agreement and their duty of good faith and fair dealing.

WHEREFORE, REVERE demands judgment against SEAWORLD for compensatory damages, an accounting, prejudgment interest, and costs.

## COUNT II –  BREACH OF IMPLIED CONTRACT AND DUTY OF GOOD FAITH AND FAIR DEALING AGAINST SEAWORLD, SMITHINK, AND JCO

232.   This is an action by REVERE against SEAWORLD, Smithink, and JCo for damages that exceed $15,000.00 for breach of the Agreement.

233.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above and Paragraphs 222 through 232 from

Count I, Breach of Contract, above.

234.   REVERE submitted the Works and ideas to SEAWORLD for sale.

235.   As agents, affiliates, beneficiaries, and former employees of SEAWORLD, Smithink and JCo were bound by the terms of the Agreement.

236.   Upon information and belief, REVERE alleges that SEAWORLD also assigned the benefits, rights, and obligations under the Agreement to Smithink, JCo, Atchison, Andrews, Kasen, and Glashower.

237.   SEAWORLD induced REVERE's Second Presentation wherein SEAWORLD acquired REVERE's propriety and confidential materials and trade secrets in the Works pursuant to an agreement that SEAWORLD would not use the Works without paying REVERE and without REVERE's consent.

238.   SEAWORLD, Smithink, and JCo knew of, and agreed to, the conditions to REVERE's disclosure of the Works.

239.   SEAWORLD, Smithink, and JCo voluntarily accepted the Works and Business Plan.

240.   As such, an implied contract existed, by operation of law, between SEAWORLD, Smithink, and JCo and REVERE for the submission of REVERE's ideas.

241.   SEAWORLD, Smithink, and JCo actually used REVERE's Works and Business Plan in conscious disregard for REVERE's rights under the implied contract.

242.   REVERE's Works and Business Plan had commercial value.

243.   SEAWORLD, Smithink, and JCo breached the implied contract by failing to pay REVERE for SEAWORLD's use and exploitation of the Works and Business Plan.

244.   REVERE has not received any legal or equitable consideration for SEAWORLD, Smithink, and JCo using and exploiting REVERE's Works and Business Plan.

245.   SEAWORLD, Smithink, and JCo have therefore been unjustly enriched as a result of their wrongful actions and wrongfully acquired information from REVERE.

246.   REVERE is entitled to restitution for the unjust enrichment of SEAWORLD, Smithink, and JCo's use and exploitation of REVERE's Works, present and future without paying.

247.   As a direct and proximate result of SEAWORLD, Smithink, and JCo's breaches, REVERE has suffered damages, which will continue to accrue each month.

WHEREFORE, REVERE demands judgment against SEAWORLD,

Smithink, and JCo, jointly and severally, for compensatory damages, prejudgment interest, attorneys' fees, and costs.

## COUNT III – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST SEAWORLD, SMITHINK, AND JCO

248.   This is an action by REVERE against SEAWORLD, Smithink, and JCo for damages that exceed $15,000.00 under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

249.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above, Paragraphs 222 through 232 from Count I, Breach of Contract, above, and Paragraphs 235 through 248 from Count II, Breach of Implied Contact, above.

250.   FDUTPA renders unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" provided to consumers. *See* Section 501.204(1), *Fla. Stat.* (2010).

251.   At all relevant times, REVERE was a consumer as defined by § 501.203(7), *Fla. Stat.* (2010).

252.   At all relevant times, SEAWORLD advertised, solicited, provided, offered, and distributed goods and services by developing, owning, and operating theme parks for consumers to both participate in

developing and attending/enjoying the finished products and thus were engaged in "trade or commerce" as defined in § 501.203(8), *Fla. Stat.* (2010).

253. At all relevant times, Smithink advertised, solicited, provided, offered, and distributed goods and services by developing, selling, and advertising attractions/elements for theme parks and other consumers and thus was engaged in "trade or commerce" as defined in § 501.203(8), *Fla. Stat.* (2010).

254. At all relevant times, JCo advertised, solicited, provided, offered, and distributed goods and services by developing, selling, and advertising attractions/elements for theme parks and other consumers and thus was engaged in "trade or commerce" as defined in § 501.203(8), *Fla. Stat.* (2010).

255. At all relevant times, SEAWORLD's unfair practices regarding the use and exploitation of REVERE's Works were immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and identifiable by any third party.

256. At all relevant times, Smithink's unfair practices regarding the use and exploitation of REVERE's Works were immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and

identifiable by any third party.

257.   At all relevant times, JCo's unfair practices regarding the use and exploitation of REVERE's Works were immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and identifiable by any third party.

258.   As a direct and proximate result of SEAWORLD, Smithink, and JCo's actions, REVERE has been harmed.

WHEREFORE, REVERE demands judgment against SEAWORLD, Smithink, and JCo, jointly and severally, for compensatory damages, prejudgment interest, an award of attorneys' fees and costs, and reserving the right to seek punitive damages at a later date upon a proper showing.

## COUNT IV – COMMON LAW UNFAIR COMPETITION AGAINST SEAWORLD, SMITHINK, AND JCO

259.   This is an action by REVERE against SEAWORLD, Smithink, and JCo for damages that exceed $15,000.00 for Florida common law unfair competition.

260.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 34, 37 through 47(a), 47(c) through 70, 72 through 96, 98 through 107, 108(b) through 198, and 201 through 219 above.

261.   REVERE entered into a contractual relationship with SEAWORLD by virtue of the agreements, including, without limitation, the

Agreement, which confirmed REVERE's exclusive ownership of the Works and Business Plan and conferred an implied duty of good faith and fair dealing.

262.   As agents, affiliates, beneficiaries, and former employees of SEAWORLD, Smithink, and JCo were bound by the terms of the Agreement.

263.   During the Second Presentation, REVERE disclosed in detail their creative concepts, the Works, the Business Plan, how to exploit the creative concepts and the Works, strategy, concepts, marketing, execution, and the methods in which SEAWORLD's parks would be transformed into a new look and design by incorporating REVERE's Australian themes.

264.   Upon information and belief, REVERE alleges that SEAWORLD also assigned the benefits, rights, and obligations under the Agreement to Smithink and JCo who have benefitted from the Agreement.

265.   SEAWORLD, Smithink, and JCo lead REVERE to believe that they would be partners in a confidential business relationship but instead became competitors to REVERE, knowing that REVERE was in the business of exploiting theme park opportunities in the same market.

266.   Thus, SEAWORLD, Smithink, and JCo are competitors with REVERE in the area of exploiting commercial opportunities and ideas in the

theme park industry.

267. SEAWORLD, Smithink, and JCo misappropriated, for the commercial advantage of SEAWORLD, Smithink, and JCo, REVERE's confidential and proprietary information in the Works and Business Plan belonging to REVERE.

268. SEAWORLD, Smithink, and JCo's actions were deceptive because fraudulently induced REVERE to enter into what was presented as a confidential business relationship and disclose the Works.

269. SEAWORLD, Smithink, and JCo's actions are also deceptive and give a likelihood of consumer confusion because as competitors, REVERE is, in essence, forced to compete with its own ideas, concepts, and Works in the market, to the extent that there is a remaining market for such ideas.

270. SEAWORLD, Smithink, and JCo's practices, including, without limitation, regarding their advertising and relations with investors constitute deceptive conduct and will likely lead to consumer confusion.

271. Without license or consent, SEAWORLD is using REVERE's Works and Business Plan, which REVERE owns and controls, to generate revenue and profits from, among other things, the sale of admission tickets and related merchandise in competition with REVERE in the same area

REVERE's Works and Business Plan are established.

272.   Without license or consent, Smithink, and JCo are using REVERE's Works and Business Plan, which REVERE owns and controls, to sell and profit from the designs therein and related merchandise in competition with REVERE in the same market area REVERE's Works and Business Plan, namely the theme park industry.  Smithink and JCo are also using REVERE's Works to provide their companies with notoriety and public good will and advancement in the theme park industry.

273.   As alleged above, SEAWORLD, Smithink, and JCo have actively interfered, prevented and damaged REVERE's opportunities to use and sell their Works to other theme parks or vendors who may wish to exploit REVERE's Works in exchange for compensation.

274.   Moreover, upon information and belief, SEAWORLD, Smithink, and JCo have executed new contracts for the use and further development of amusement park attractions using REVERE's Works and Business Plan, in competition with REVERE in the same area where REVERE's Works and Business Plan are established.

275.   SEAWORLD, Smithink, and JCo continue to use REVERE's Works and Business Plan.

276.   SEAWORLD, Smithink, and JCo's actions will likely cause

consumer confusion as to the source and sponsorship of the attractions being used and the merchandise being sold, when REVERE owns such rights.

277.   SEAWORLD, Smithink, and JCo are abusing a relationship of trust with REVERE by their misappropriation and exploitation of REVERE's confidential information in the Works and Business Plan.

278.   SEAWORLD, Smithink, and JCo behaved in a corrupt and intentional manner by converting REVERE's Works and Business Plan, as well as REVERE's goodwill, abusing the trust reposed in SEAWORLD by REVERE and then further using that information to SEAWORLD, Smithink, and JCo's benefit at the detriment of REVERE.

279.   As a direct and proximate result of SEAWORLD, Smithink, and JCo's intentional and willful actions, REVERE has been harmed and continues to be damaged.

280.   As a consequence, REVERE has already suffered a loss of business proceeds in an amount to be determined at trial, but believed to be in excess of millions of dollars.

281.   In addition to money damages, REVERE is entitled to an immediate temporary injunction and a permanent injunction.

WHEREFORE, REVERE demands judgment against SEAWORLD, Smithink, and JCo, jointly and severally, for compensatory and

consequential damages, reserving the right to seek punitive damages at a later date upon a proper showing, prejudgment interest, and court costs.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS AGAINST SEAWORLD, SMITHINK, AND JCO

282.   This is an action by REVERE against SEAWORLD, Smithink, and JCo for damages that exceed $15,000.00 for misappropriation of trade secrets under *Florida Statutes*, Chapter 688.

283. REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above.

284.   REVERE's confidential information, including, but not limited to, the Works and Business Plan, constitute trade secrets and proprietary and confidential information belonging solely to REVERE.

285.   REVERE's Works and Business Plan contain trade secrets including formulas, ideas, concepts, design patterns, methods, and techniques in the Business Plan, which have economic value, actual or potential, to make Australian Extremes and related Australian attractions successful.

286. REVERE's Works, Business Plan, and trade secrets had independent economic value in 2006 from not being generally known to, and not readily ascertainable by, people who could obtain economic value from its disclosure or use.

287.   REVERE took reasonable precautions and numerous efforts to keep the Works, Business Plan, and trade secrets therein confidential, secret, and protected from the general public under the circumstances, including, without limitation, historical use of non-disclosure agreements with team members.

288.   Therefore, under the circumstances, REVERE had a reasonable expectation of secrecy in the Works and Business Plan.

289.   REVERE's Works and Business Plan are highly valuable and were created over a long period of time, after the expenditure of monies and time to develop and design all elements and components of Australian Extremes.

290.   SEAWORLD, Smithink, and JCo willfully and maliciously misappropriated REVERE's confidential and proprietary information and trade secrets from REVERE's Works and Business Plan.

291.   As agents, affiliates, beneficiaries, and former employees of SEAWORLD, Smithink, and JCo were bound by the terms of the Agreement.

292.   Upon information and belief, REVERE alleges that SEAWORLD also assigned the benefits, rights, and obligations under Agreement to Smithink and JCo.

293.   By virtue of the agreements, including, without limitation, the Agreement, SEAWORLD, Smithink, and JCo knew that REVERE's Works, Business Plan, and trade secrets therein were confidential and to remain within SEAWORLD for conclusion of the purchase of  the Works and Business Plan from REVERE.

294.   By virtue of the agreements, including, without limitation, the Agreement, SEAWORLD, JCo, and Smithink knew that REVERE's Works and Business Plan belonged to REVERE and could not be used, disclosed outside of SEAWORLD, or exploited for profit without permission from REVERE and paying for the same.

295.   By virtue of the agreements, including, without limitation, the Agreement, SEAWORLD, Smithink, and JCo knew or should have known that they had a duty to REVERE to maintain secrecy of the Works and limit the use of the Works and Business Plan unless and until a contract was entered into with REVERE to pay REVERE for use of the Works and Business Plan.

296.  Smithink and JCo knew or had reason to know that SEAWORLD acquired REVERE's Works, Business Plan, and trade secrets through SEAWORLD's duty to maintain the secrecy within SEAWORLD and who used an improper means to acquire REVERE's trade secrets by

inducing REVERE to enter the Agreement without the intent to pay REVERE to use the Works, Business Plan, and trade secrets.

297.   SEAWORLD and Smithink disclosed REVERE's trade secrets without consent of REVERE, who owned the Works, Business Plan, and trade secrets.

298.   In addition, JCo disclosed REVERE's Works, Business Plan, and trade secrets to others not subject to non confidentiality provisions in the Agreement without consent of REVERE, who owned the Works, Business Plan, and trade secrets. At the time JCo disclosed REVERE's trade secrets, JCo knew or had reason to know that its knowledge of the trade secrets were derived from SEAWORLD and/or Smithink, who derived the trade secrets through improper means, who had a duty of secrecy or limited use to REVERE, and/or who learned that it was acquired through mistake/accident.

299.   SEAWORLD, Smithink, and JCo's actions of disclosing REVERE's trade secrets, was without consent and improper.

300.   SEAWORLD, Smithink, and JCo have derived economic value and deprived REVERE from economic value of the Works and Business Plan in numerous ways, including, without limitation, parks, videos, advertising, promotion, attendance, sales, notoriety, and good will.

301.   As a consequence, REVERE has suffered a loss of business

proceeds in an amount to be determined at trial, but believed to be in the millions of dollars.   REVERE is therefore entitled to damages for the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation, including actual loss and a reasonable royalty for SEAWORLD, Smithink, and JCo's unauthorized disclosure and use of REVERE's trade secrets in the Works and Business Plan.

302.   In addition to money damages, REVERE is entitled to an immediate temporary injunction and a permanent injunction.

WHEREFORE, REVERE demands judgment against SEAWORLD, Smithink, and JCo, jointly and severally, for compensatory damages, reserving the right to seek punitive damages at a later date upon a proper proffer, prejudgment interest, attorneys' fees, and costs.

### <u>COUNT VI – CONVERSION AGAINST SEAWORLD</u>

303.   This is an action by REVERE against SEAWORLD for damages that exceed $15,000.00 for conversion.

304.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above.

305.   SEAWORLD has unlawfully converted REVERE's  property: Books containing confidential information and trade secrets within the Works and Business Plan.

306.   REVERE has an immediate superior right of possession in the converted property of REVERE's Books containing the Works and Business Plan.

307.   SEAWORLD exercised unauthorized dominion over the converted property to the exclusion of REVERE's rights.

308.   SEAWORLD's taking of such property, and the failure to return same, constitutes conversion.

309.   As a consequence, REVERE has already suffered a loss of business proceeds in an amount to be determined at trial, but believed to be in excess of millions of dollars.

310.   In addition to money damages, REVERE is entitled to an immediate temporary injunction and a permanent injunction.

WHEREFORE, REVERE demands judgment against SEAWORLD for compensatory damages, reserving the right to seek punitive damages at a later date upon a proper proffer, prejudgment interest, attorneys' fees, and costs.

## COUNT VII – NEGLIGENT MISREPRESENTATION AGAINST SEAWORLD AND ANDREWS

311.   This is an action by REVERE against SEAWORLD and Andrews for damages that exceed $15,000.00 for negligent misrepresentation.

312.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above.

313.   SEAWORLD and Andrews owed REVERE a duty to act with reasonable care with respect to representations made to induce REVERE to give their First and Second Presentation and disclose their Works and Business Plan.

314.   SEAWORLD and Andrews breached their duty to REVERE by failing to properly advise REVERE regarding SEAWORLD's intentions regarding the First and Second Presentations and by giving REVERE affirmations that its Works and Business Plan were protected and would not be used without payment to REVERE.

315.   As a direct and proximate result of SEAWORLD and Andrews' negligence, REVERE has been damaged.

WHEREFORE, REVERE demands judgment against SEAWORLD and Andrews, jointly and severally, for compensatory damages, prejudgment interest, attorneys' fees, and costs.

## COUNT VIII –  CONSTRUCTIVE FRAUD AGAINST SEAWORLD AND ANDREWS

316.   This is an action in equity by REVERE against SEAWORLD and Andrews for damages that exceed $15,000.00 for constructive fraud.

317.   REVERE realleges and incorporates herein by reference

Paragraphs 1 through 219, above.

318.   SEAWORLD and Andrews had a confidential business relationship with, and duty to, REVERE with respect to REVERE's Works and Business Plan, as evidenced by SEAWORLD and Andrews' actions, assurances, written correspondence, and course of dealings, as alleged in detail above.

319.   REVERE reposed confidence in SEAWORLD and Andrews, and SEAWORLD and Andrews accepted it, resulting in superiority and influence on the part of SEAWORLD and Andrews.

320.   SEAWORLD and Andrews owed REVERE a duty to act with reasonable care with respect to representations made to induce REVERE to give their First and Second Presentation and disclose their Works and Business Plan.

321.   SEAWORLD and Andrews abused and took advantage of their confidential business relationship with REVERE when they were bound in equity and good conscience to act in good faith and in REVERE's interest.

322.   SEAWORLD and Andrews breached their duty to REVERE by:

a)     failing to pay REVERE for the Works and Business Plan in exchange for their use of the same;

b)      disclosing the Works and Business Plan beyond the zone of

confidence within SEAWORLD;

c)      failing to execute written contract as to their use and

REVERE's ideas in the Works and Business Plan; and

d)      failing to disclose to REVERE their actions and

misappropriations.

323.   As a direct and proximate result of SEAWORLD and Andrews'

actions, REVERE has been damaged.

WHEREFORE, REVERE demands judgment against SEAWORLD

and Andrews, jointly and severally, for compensatory damages, prejudgment

interest, attorneys' fees, and costs.

### COUNT IX – CIVIL CONSPIRACY AGAINST SEAWORLD, SMITHINK, JCO, KASEN, ATCHISON, ANDREWS, GLASHOWER, SMITH, FREIN AND BRODERSEN

324.   This is an action by REVERE against SEAWORLD, Smithink,

JCo, Kasen, Atchison, Andrews, Glashower, Smith, Frein, and Brodersen for

damages that exceed $15,000.00 for civil conspiracy.

325. REVERE realleges and incorporates herein by reference

Paragraphs 1 through 219, above, Paragraphs 222 through 232 from Count I,

Breach of Contract, above, Paragraphs 235 through 248 from Count II,

Breach of Implied Contact, above, Paragraphs 284 through 302, from Count

V, Misappropriation of Trade Secrets, above, and Paragraphs 318 through 323, from Count VIII, Constructive Fraud, above.

326. SEAWORLD, Smithink, JCo, Atchison, Kasen, Andrews, Glashower, Smith, Frein, and Brodersen each personally and directly participated in SEAWORLD's tortious conduct and breaches of the Agreement as detailed and incorporated above.

327. SEAWORLD, Smithink, JCo, Kasen, Atchison, Andrews, Glashower, Smith, Frein, and Brodersen acted in concert in conspiring to abuse the rights and interests of REVERE inherent in their relationship with SEAWORLD by committing unlawful, overt acts and omissions.

328. As a direct and proximate result of SEAWORLD, Smithink, JCo, Kasen, Atchison, Andrews, Glashower, Smith, Frein, and Brodersen's actions, REVERE has been damaged.

WHEREFORE, REVERE demands judgment against SEAWORLD, Smithink, JCo, Kasen, Atchison, Andrews, Glashower, Smith, Frein, and Brodersen, jointly and severally, for compensatory damages, reserving the right to seek punitive damages at a later date upon a proper proffer, prejudgment interest, attorneys' fees, and costs.

## COUNT X –ACCOUNTING AGAINST SEAWORLD

329. This is an equitable action by REVERE against the

SEAWORLD for an accounting.

330.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above, and Paragraphs 222 through 232 from Count I, Breach of Contract, above.

331.   REVERE and SEAWORLD entered into valid agreements, including, without limitation, the Agreement for review, for the sale, and for the purchase of REVERE's submission of products, ideas and materials, Works and Business Plan.  *See* **Exhibit "A,"** Agreement, Sections 2, 3.

332.   The Agreement required SEAWORLD to pay REVERE for compensation for use and exploitation of the Works and Business Plan, both impliedly and by the express requirement that a formal, written contract would be executed prior to SEAWORLD's use.

333.   SEAWORLD and REVERE agreed that payment would be made to REVERE as a condition of SEAWORLD's use of the Works.

334.   SEAWORLD failed to pay REVERE despite using and exploiting REVERE's Works and Business Plan.

335.   SEAWORLD has derived revenues from its use of the Works.

336.   In order to determine the exact amounts due, REVERE is entitled to a complete accounting from SEAWORLD regarding transactions, including, without limitation, revenues, profits, benefits, consideration of

any kind, licensing fees, construction estimates, and construction costs of each of the attractions/elements that are contained in REVERE's Works and Business Plan.

337.   Without an accounting, REVERE does not have an adequate remedy at law to determine the amount owed to REVERE for SEAWORLD's use and exploitation of the Works and Business Plan.

WHEREFORE, REVERE demands relief in the form of an Order for an accounting by SEAWORLD regarding transactions, including, without limitation, revenues, profits, benefits, consideration of any kind, licensing fees, construction estimates, and construction costs of each of the attractions/elements that are contained in REVERE's Works and Business Plan, together with attorneys' fees and costs.

## COUNT XI – ACTION FOR UNJUST ENRICHMENT AGAINST SEAWORLD, SMITHINK, AND JCO

338.   In the alternative, this is an action in equity by REVERE against SEAWORLD, Smithink, and JCo for unjust enrichment.

339.   REVERE realleges and incorporates herein by reference Paragraphs 1 through 219, above.

340.   Smithink and JCo were agents, affiliates, beneficiaries, and former employees of SEAWORLD.

341.   Upon   information   and   belief,   REVERE   alleges   that

SEAWORLD also assigned the benefits, rights, and obligations under Agreement to Smithink and JCo.

342.   SEAWORLD, Smithink, and JCo's relationship with REVERE was one of trust and confidence as parties engaged in confidential business relationship.

343.   SEAWORLD negligently misrepresented facts to induce REVERE to disclose the Works and Business Plan to give SEAWORLD, Smithink, and JCo the benefits conferred, as alleged in Paragraphs 313 through 315, above, incorporated herein.

344.   The confidential, trusting business relationship between REVERE and SEAWORLD, Smithink, and JCo was for purpose of paying REVERE for the Works and Business Plan.

345.   SEAWORLD, Smithink, and JCo are currently using REVERE's Works and Business Plan without permission or payment.

346.   In the context of a confidential business relationship, REVERE conferred a benefit upon SEAWORLD, Smithink, and JCo, who had knowledge thereof, by disclosing REVERE's Works and Business Plan.

347.   SEAWORLD, Smithink, and JCo voluntarily accepted and retain the benefits conferred by REVERE.

348.   SEAWORLD, Smithink, and JCo have received profits

attributable to their use of REVERE's trade secrets in the Works and Business Plan.

349.   REVERE has not received any legal or equitable consideration for SEAWORLD, Smithink, and JCo using and exploiting REVERE's Works and Business Plan.

350.   SEAWORLD, Smithink, and JCo have therefore been unjustly enriched as a result of their wrongful actions and wrongfully acquired information from REVERE.

351.   As a direct and proximate result of SEAWORLD, Smithink, and JCo's actions, REVERE has been damaged.

352.   REVERE does not have an adequate legal remedy at law.

353.   REVERE is entitled to restitution for the unjust enrichment of SEAWORLD, Smithink, and JCo's use and exploitation of REVERE's Works, present and future.

354.   It is inequitable for SEAWORLD, Smithink, and JCo to retain the benefits from REVERE's Works and Business Plan without paying the value thereof to REVERE.

WHEREFORE, REVERE demands judgment against SEAWORLD, Smithink, and JCo, jointly and severally, for compensatory damages, prejudgment interest, attorneys' fees, and costs.

## <u>DEMAND FOR JURY TRIAL</u>

355.   PLAINTIFFS demand a jury trial on all issues so triable.

**DATED THIS 31st OF MARCH, 2011.**

*Attorneys for Plaintiffs*

**MORGAN & MORGAN, P.A.**

By:  /s Tucker H. Byrd
Tucker H. Byrd
Florida Bar No. 381632
Clay M. Townsend
Florida Bar No. 363375
David Oliver                                      **Law Office of Nicole Weaver,**
Florida Bar No. 521922                            **PLLC**
Lauren C. Heatwole                                A. Nicole Weaver
Florida Bar No. 674583                            Fl. Bar Number 0529389
20 North Orange Avenue, Suite 1000                P.O. Box 533713
Orlando, Florida  32801                           Orlando, FL 32853
Telephone: (407) 420-1414                         Phone 407-263-3006
Facsimile: (407) 418-2048                         E-Mail:
Email:                                            Nicole@LegalWeaver.com
TByrd@BusinessTrialGroup.com
CTownsend@BusinessTrialGroup.com
DOliver@BusinessTrialGroup.com
LHeatwole@BusinessTrialGroup.com